### H. F. WILCOX OIL & GAS CO. et al. v. JUEDEMAN.

No. 28073. April 2, 1940.

Rehearing Denied June 4, 1940.

*101 P. 2d 1050.*

Horace B. Clay, L. G. Owen, Forrest M. Darrough, Geo. Bowen, J. R. Ramsey, B. W. Griffith, W. M. Fleetwood, Jr., A. C. Cochran, W. P. Z. German, Hawley C. Kerr, E. R. Hastings, and W. B. Abbott, all of Tulsa, G. B. Cantrell, of Bartlesville, and J. E. Thrift, of Sapulpa, for plaintiffs in error.

George H. Jennings, of Sapulpa, for defendant in error.

RILEY, J. W. A. Juedeman, plaintiff below, commenced this action April 4, 1934, to recover damages in the sum of $15,410, alleged to have been caused by overflow of 134 acres of his land from a creek running through the land in which the water had been polluted by salt water, oil, and other poisonous substances allowed to flow from oil and gas wells operated by defendants, Wilcox Oil & Gas Company and 15 other oil companies and an individual.

Plaintiff acquired the land January 21, 1932. It lies within the valley of Little Deep Fork creek, which flows through said land. About 70 acres of the land is subject to frequent overflows from the creek. The petition of plaintiff, after al-

leging the location of oil and gas wells operated by defendants within the watershed of said creek and above plaintiff's land, and that defendants had for two years next preceding the filing of the petition allowed large quantities of oil, salt water, base sediment, and other deleterious substances to escape from their wells and flow into said creek and its tributaries and down and across plaintiff's said land; alleged that numerous times during said two years heavy rains fell within the area causing said creek to overflow its banks and the waters thereof contaminated with oil, salt water, and to spread out over said land and thoroughly contaminate and impregnate all of said land, thereby injuring said land for farming purposes, killing a large number of valuable pecan trees growing on said land and thereby diminishing the market value of said land to the extent of $15,410.

Defendants filed separate answers, and in addition to other defenses, pleaded the statute of limitations, alleging that if any injury had been done to the land in question as a result of the escape of oil, salt water, etc., into said creek, the cause of action therefor accrued more than two years before the commencement of this action, and was barred by the statute of limitations of subdivision 3, sec. 101, C. O. S. 1931.

A supplemental joint answer by 16 of the defendant companies set up as an additional defense that plaintiff and his predecessors in title had contributed to the injury, in that they had kept and maintained on said land, for a long time prior to the commencement of this action, a "slush pit" in which was deposited a large quantity of oil, base sediment, and other oil well refuse; that said "slush pit" and its contents is located on higher ground than the pecan groves or trees, and that during rains and overflows, large quantities of such refuse escaped from said slush pit and flowed over the land; that plaintiff also owned, operated, kept, and maintained an oil and gas well located on said premises from which he permitted salt water, oil, and other

oil field refuse to escape and flow over said land and commingle with any polluted water that was alleged to have been allowed to escape from defendant's well and flow into said creek and over plaintiff's land, and that plaintiff had thereby in whole or in part contributed to the loss, damage, and injuries, if any, to his said land. Plaintiff replied by general denial.

Trial was had to a jury resulting in a verdict and judgment in favor of plaintiff in the sum of $1,500, and defendants appeal.

The petition in error contains 15 specifications of alleged error. Specifications 5, 7, 8, 9, and 15 go to matters not in any way involving the question of the statute of limitations, and are expressly waived by defendants in their brief.

All other specifications are claimed to involve questions going to the plea of statute of limitations, and are presented under one general proposition.

The parties entered into written stipulation that defendants and each of them, prior to and during the two years next before the commencement of this action, separately owned and operated oil and gas mining leases located as alleged in the petition; that Little Deep Fork creek is subject to overflow during heavy rains, and at such times the water from the creek covers a portion of plaintiff's land, and:

"3. That during all times for the period of ten years next prior to the date of the filing of plaintiff's petition herein said Little Deep Fork Creek was in a state of pollution as a result of the escape of salt water from operations conducted on said watershed.

"4. That salt water escaped from the leaseholds operated by the defendants during the two year period next preceding the said filing of plaintiff's petition and contributed to the pollution in said Little Deep Fork creek.

"5. That the escape of salt water from the leaseholds of said defendants into said stream has been, is and will be a necessary incident to the operations of

said leasehold estates and in no wise attributable to actual negligence of said defendants, or either of them, or any negligence other than such as the law may imply from the fact of escape.

"6. That as an incident to the operation of leaseholds on said watershed the production of salt water has so saturated the lands upon which operations have been had that said stream will be polluted for an indefinite period independent of the results of continued operations contributing thereto."

It was further stipulated that both parties might introduce such evidence as they might desire as to amount, quantity, and quality of salt water that may have escaped and run into said stream during and before the two-year period and as to its effect upon plaintiff's premises both before and during the two years next preceding the filing of the petition.

Defendants moved for a directed verdict upon the ground that the facts stipulated, considered in connection with plaintiff's petition, showed on their face that plaintiff was not entitled to recover.

This motion was overruled, and defendants saved exceptions.

Defendants concede that with a single exception, hereinafter noted, the facts in this case are like those in the cases of H. F. Wilcox Oil & Gas Co. v. Johnson, 184 Okla. 198, 86 P. 2d 51, and H. F. Wilcox Oil & Gas Co. v. Joe Allen, 184 Okla. 196, 89 P. 2d 55, so as to bring this case within the doctrine of those cases.

They then contend that the rule in the Johnson Case conflicts with the general law, and cite a number of cases seeking to have the Johnson and Allen Cases, supra, overruled.

The contention of defendants is that because the stipulation of facts in this case conclusively shows that the stream running through plaintiff's land had been thoroughly polluted by the escape of salt water from defendants' wells, for ten years before this action was commenced, and that the escape of salt water is and

was a necessary incident to the operation of said leasehold estates and in no way attributable to actual negligence, the source or cause of the pollution of the stream is in law considered as unabatable and permanent; that the statute of limitations has run against any action for damages on account of injury to the land caused by such pollution. In other words, they contend that the structure or source of the pollution being permanent or unabatable, there is and has been a basis of a single action for permanent injury, and that the cause of action therefrom accrued long before plaintiff acquired his land.

After the briefs were filed in this case we had occasion to consider the question under the same contention in the case of Wilcox Oil & Gas Co. v. Murphy, 186 Okla. 188, 97 P. 2d 84. The question there, as it is here, was ably presented and well briefed. In the Murphy Case we adhered to the rule announced in the Johnson Case. We deem it unnecessary to again review the question.

At the time the motion for a directed verdict was presented and overruled, no evidence other than the stipulation had been introduced. Under the doctrine of the Johnson and Murphy Cases, it was not made to appear as a matter of law that plaintiff's cause of action, insofar as was concerned an injury to his land apart from loss of the use of the stream as a source of water supply, that the action was barred by the statute of limitations. There was no error in overruling the motion for a directed verdict.

The next and only other contention made is that the trial court erred in not submitting the question whether the action was barred by the statute of limitations to the jury under the pleadings and all the evidence.

After the trial court overruled the motion for a directed verdict under the pleadings and stipulation, a great deal of evidence was introduced as to the pollution of the stream, overflow of the lands both before and within the two-year period next before the commence-

ment of this action, its effect on the land, and its effect on the value of the land.

Most of plaintiff's evidence was to the effect that after he acquired the land involved, and particularly during the years 1932 and 1933, Little Deep Fork creek overflowed a number of times, twice in 1932, and three times in 1933; that in such overflow 70 acres of plaintiff's land was covered by the water from said creek, which water deposited large quantities of salt on the land; that as a result a large number of valuable pecan trees growing on said land died; that prior to such overflow, plaintiff's land was of the reasonable market value of from $125 to $250, or more, per acre, and after said overflow and the destruction of the pecan trees, etc., the reasonable market value of said land was from $20 to $30 per acre. There was also evidence tending to show plaintiff paid about $3,000 for the land when he purchased it, but has expended a large amount of money in clearing out and removing underbrush and timber other than pecan trees from the land.

But two or three of plaintiff's witnesses, on cross-examination, testified Deep Fork creek was and had been subject to frequent overflows, and had overflowed its banks and the land now owned by plaintiff a number of times both before and after January 31, 1931. One witness in particular, Gus Johnson, testified in part:

"Q. Was there any change in the character of pollution in the creek between the year 1929 and 1930, we will say? A. Well, if there was, it was very little. Q. When did the appreciable change take place? A. Along about 1931. Q. That is the floods you had in the spring of 1931? A. We didn't have any floods. We had one in the fall of 1929 and one way back in 1925. Q. Didn't you have two or three floods in the fall and winter of 1930 and one or two floods in the spring of 1931? A. Well, I don't remember having two or three. We had one in the fall of 1931, in October, and one in November, 1931. * * * Q. As a result of those floods in the fall of 1931, what deposit did it leave on the ground? * * * A. Left oil and substance of white scale on the cotton and

land and both. Q. Quite a lot? A. So much they wouldn't even buy the cotton. Q. You are talking about the two floods in 1930 and 1931? A. Yes. Q. From your knowledge of the stream and of the pollution and the bottom lands in Little Deep Fork, would you say that all of the land was affected about the same way? A. It was all affected, yes, about the same way. * * * Q. What effect did those two floods have on the fertility of the soil in Little Deep Fork bottom? A. All the way I know is by the crops we raised. It cut our crop average down half. Q. The two floods cut your crop averages down half? A. Yes. Q. That indicates to you then, doesn't it, that the land had been damaged 50 per cent. by reason of the two floods? A. Something like that, yes. Q. And that would be true as to all of the bottom land in the entire bottom. Is that right? A. It would. Q. You tell the jury that all of the overflow bottom land in Little Deep Fork, as a result of the two floods in the fall of 1931 which left deposits of salt water and oil on it, the market value of those lands had been diminished to the extent of 50 per cent. A. I do. Q. As a result of those two floods in 1931, did it do anything to the trees? * * * A. Killed a lot of them. * * * Q. So if Juedeman's land was worth $120 to $130 per acre on April 4, 1932, after it had been damaged to the extent of 50 per cent., as you have just testified, then except for that damage his farm would have been worth from $240 to $260 an acre? A. It would. * * * Q. Do you say the land on the Juedeman farm was damaged prior to April 4, 1932? A. I wasn't on the farm at that time, but I would say that it was damaged to a certain extent. Q. And you said 50 per cent.? A. Yes, sir."

Another witness, Joe Allen, testified in part:

"Q. When did you say that the lands in the bottoms of Little Deep Fork were injured from salt water,—when did that start? Q. Just give the time. What year? A. 1931 to 1932. Q. Was 1931 the first time? A. That was the first time we noticed it. * * * Q. How many overflows did you have in the fall of the year of 1931? A. Had two. Q. Did the whole Little Deep Fork overflow at that time? A. Yes, sir. Q. After that water went back into the banks and the high water went down, what did you see with reference to salt water and oil on the surface of the overflow land? A. Well, it left a de-

posit of salt, of course. Q. What did that look like? Describe it to the jury. A. After the ground dried off, it left little white stuff on the soil. Q. Could you rake it up with your hand,—that salt? A. It wasn't so thick you could scoop it up,—nothing like that. Q. Now, that salt as a result of the overflow injured the lands in Little Deep Fork bottoms, didn't it? A. Yes. Q. Did that hurt it much or little? A. Hurt it enough you couldn't raise nothing on it. Q. As a result of the overflows in the fall of 1931? A. Yes, sir. Q. Now, then, you would say then that your lands and all of the lands of the Little Deep Fork bottoms were ruined to the extent that you couldn't raise anything on it as a result of the two overflows in 1931? A. Of course, these other overflows helped ruin it. Q. But it hurt it to a great extent; that is, the two overflows in the fall of 1931? A. No. Q. Didn't you just testify to that awhile ago? A. I didn't testify it completely ruined it,—it helped ruin it. Q. It helped ruin it? * * * A. Certainly. Q. The three overflows you spoke about, did they do the land any good? A. No, they didn't. Q. Did they damage the land? A. Yes, sir. Q. Much or little? A. Quite a bit. Q. Now then, you testified, in answer to Mr. Jennings' question, that this land, the Juedeman land, was worth $125 to $130 per acre on April 4, 1932? A. Yes, sir. Q. And that was after the three floods had occurred that you have testified about, which damaged the lands quite a bit, as you have just said. Is that true? A. That is true. Q. What would this land have been worth on April 4, 1932, if he hadn't had the three floods I have just referred to? * * * A. The Juedeman land would have been worth about $150 or $175 an acre if it hadn't overflowed."

Another witness for plaintiff testified in substance that all the land in Little Deep Fork creek valley, subject to overflow, including the plaintiff's land, had been materially injured by oil field pollution prior to January, 1932.

Most of defendants' witnesses, however, testified that in their judgment plaintiff's land, aside from the pollution of the creek itself, had never been materially injured by oil field pollution.

There was evidence tending to show that some pecan trees on plaintiff's land had died prior to 1932, but there was no direct evidence as to what caused those trees to die.

Defendants requested a number of instructions going to the question of the applicable statute of limitations. Among these was instruction No. 9, requested by defendants and refused by the court. It reads:

"You are instructed that if you find and believe from the evidence, the land involved herein was injured to any appreciable extent prior to the 4th day of April, 1932, and that such injury or injuries were caused by an unabatable condition in the oil fields, your verdict must be for the defendants though you may further find that such lands sustained additional injuries subsequent to said date."

Defendants contend that the court should have given that instruction or an instruction substantially the same, and that the trial court did not in any other instruction, nor in the instructions as a whole, submit the question of the statute of limitations to the jury.

The court did in the first part of instruction No. 21 tell the jury:

"In regard to the statute of limitations, as urged by the defendant herein as a defense to the claim made by the plaintiff, you are instructed that in an action for damages for permanent injury to real estate caused by continuing salt water pollution, the statute of limitations begins to run at the time it becomes obvious that a permanent injury has been suffered."

And then in the same instruction:

"You are instructed, however, that where such injury, if any, grows progressively greater due to a continuation of such pollution from salt water and other oil field refuse, the statute of limitation bars recovery only for the damage, if any, flowing exclusively from that portion of the permanent injury which was obvious more than two years prior to the commencement of the action. And, in this connection, you are instructed that the statute of limitations would run in this case against the recovery of all damages to plaintiff's land and trees, if any, which occurred prior to the 4th day of April, 1932."

By another instruction the court, in plain language, instructed the jury that plaintiff could not recover for or on account of any injury to the land done prior to the time he acquired it.

By another instruction the court told the jury that the case was not an action for temporary injury, nor for permanent injury flowing from an abatable cause, but was an action for injury flowing from an unabatable cause.

The question, then, is, When does the statute of limitation begin to run as to such an injury?

In Pahlka v. Chicago, R. I. & P. Ry. Co., 62 Okla. 223, 161 P. 544, we held:

"* * * In cases of injury from permanent cause, the cause of action arises at the time of the actual injury, and not at the time of the creation of the cause where such actual injury is not the obvious or necessary result, assuming the continuance or recurrence of ordinary conditions."

See, also, Indian Terr. Ill. Oil Co. v. Klaffke, 178 Okla. 62, 61 P. 2d 669; Richards v. Flight, 97 Okla. 9, 222 P. 564.

In H. F. Wilcox Oil & Gas Co. v. Murphy, 186 Okla. 188, 97 P. 2d 84, we held, in substance, that where a stream running through farm lands had been polluted by salt water, etc., escaping from an unabatable structure consisting of an extensive oil field, for such length of time as to bar an action for damages on account of pollution of the stream, but by subsequent overflows adjacent f a r m land was injured and its productivity impaired, a cause of action then accrued to the owner at the time of such injury, and may be maintained if commenced within two years.

In Cities Service Gas Co. v. Eggers, 186 Okla. 466, 98 P. 2d 1114, we held:

"In an action for damages for permanent injury to real estate caused by continual salt water pollution, the statute of limitations begins to run at the time it becomes obvious that a permanent injury has been suffered. However, in a case where the injury grows progressively greater due in continuation of the tortious acts, the statute bars recovery only for the damages flowing exclusively from that portion of the permanent injury which was obvious more than two years prior to the commencement of the action."

The opinion therein upon its face shows that the words, "where the injury grows progressively greater," meant that the later injury for which recovery was allowable was extension of injury to an additional area of plaintiff's land.

In Commercial Drilling Co. v. Kennedy, 172 Okla. 475, 45 P. 2d 534, somewhat similar language was employed. But in that case the source or cause of the injury was abatable. Under the facts in that case, successive actions would have been permissible.

The instruction requested in that case whereby defendant sought to have submitted to the jury the question of whether the statute of limitations had run was strikingly similar to the one requested and refused in the instant case. It was properly refused in the Commercial Drilling Co. Case, because the source or cause of the injury was abatable. We said in that case that the rule sought to be invoked by the defendant seems to have been applied to cases in which "the cause of the injury was not abatable, and the future effects of the nonabatable cause of the injury could be easily ascertained within the two-year period after the land became visibly affected. The distinction between causes abatable and those not abatable was again pointed out where we said: "But the statute cannot run as to damages which may later be caused by future possible injuries not yet inflicted by the possible continuance of the abatable source of injury."

It seems well settled that in an action for damages for permanent injury to real estate caused by continuing salt water pollution the limitation begins to run at the time when it becomes obvious that a permanent injury has been suffered.

If the source or structure causing the injury is unabatable, the action is for permanent injury and but one action is

permissible as applied to the area or portion of the land affected.

Therefore, if it be true in the instant case that the same land was injured and damaged to the extent of one-half of its reasonable market value before April 4, 1932, as testified by at least one witness, a cause of action to the then owner accrued when such injury became obvious, whether in 1931 or before April 4, 1932.

In such an action the plaintiff would have been entitled to recover damages for past and prospective injury occasioned by deposit of salt or other deleterious substances on the soil from the overflow of said stream.

The statute of limitations would have begun to run at the time such injury became obvious, and would have become a complete bar before April 4, 1934.

The evidence being in conflict as to such injury to the land involved herein, the question whether the statute of limitations had run became one of fact for the jury. It was error to refuse to submit the question to the jury.

The trial court doubtless fell into error because of the rule stated in the first paragraph of the syllabus in Commercial Drilling Co. v. Kennedy, supra, which rule applies where the source or cause of the injury is abatable as in the Kennedy Case or where the source or cause of the injury is unabatable and the later or subsequent injury affects a different or additional area of land.

Defendant in error presents two propositions heretofore presented, briefed, and ruled upon in a motion to dismiss the appeal. We deem it unnecessary to again consider said questions. They were given full consideration in passing upon the motion to dismiss, and we adhere to the order heretofore made denying the motion to dismiss the appeal.

Another proposition is presented to the effect that because defendants have specifically abandoned assignments of alleged error numbered 5, 7, 9, and 15, and none of the remaining assignments are specifically argued in their briefs, all such assignments are thereby waived.

Defendants have grouped the remaining assignments of error under two propositions going only to the question of the statute of limitations, and the refusal of the court to submit that question to the jury. This is permissible and is frequently done, where different assignments of error go to the same general question.

Plaintiffs further contend that defendants' assignments of alleged error numbered 13 and 14 are joint assignments, No. 13 going to alleged error in giving nine separately numbered instructions, and No. 14 goes jointly to alleged error in refusing 13 separately numbered requested instructions, and unless assignments are good as to all the instructions included, they are good as to none.

There might be merit in this contention if only the first clause of each assignment is considered. But when the assignments are read in full it becomes manifest that the contention is without merit.

The second clause in assignment No. 17 reads:

"And it is the purpose and intent of said defendants to charge in this paragraph error of the court separately and severally on account of the giving of each and every one of said numbered instructions as herein set out."

The same is said in the second clause of assignment of error No. 14, with reference to the refusal of the requested instruction mentioned and numbered therein.

The rule seems to be, where this has been raised, that a single assignment of error may embrace more than one instruction, if the instructions are designated therein by number; the assignment will be the same in effect as if each instruction objected to was named in a distinct assignment. 3 C. J. 1377-78.

Here the instructions are not only designated by number, but the assignments specifically state that error is charged

"separately and severally" on account of the giving or refusing "each and every one" of the instructions so designated by number.

This certainly is in effect the same as if each instruction objected to or requested and refused had been named in a distinct assignment.

Exception taken to a series of instructions, each separately stated, was held sufficient where the record was "to the giving of which instructions and each of them, the defendant at the time excepted." Dunham v. Holloway, 3 Okla. 244, 41 P. 140.

Finally plaintiff contends in effect that by the filing of a joint supplemental answer defendants waived and abandoned the matters theretofore set forth in their separate answers not included with the joint supplemental answer.

This contention is without merit, for the supplemental answer shows upon its face that it is filed by leave of court first had and obtained and is: "by way of and for additional defense to plaintiff's petition."

A supplemental pleading bringing additional matters is designed to strengthen the allegations of the original pleadings and supply facts which may be necessary to a complete determination of the rights of the parties touching the subject matter of the suit. It is an additional pleading and does not take the place of the original pleading. 49 C. J. 567; Wade v. Gould, 8 Okla. 660, 59 P. 11.

Plaintiff by a counter proposition asserts that the exceptions to instructions were not properly taken in that they were endorsed upon the several instructions objected to and exceptions were endorsed and allowed and signed by the court long after the trial, and therefore came too late. Notation of exceptions need not and in fact are not intended to be endorsed upon the written instructions before the case is given to the jury. The making of the record in this respect is not intended for inspection by the jury.

Lindley v. Kelly, 47 Okla. 328, 147 P. 1015.

As to the time in which it could be done in the instant case, it was stipulated that either or any party should have the right to except to the instructions or any of them at any time prior to the time a motion by either party for a new trial herein is heard, with the same force and effect as though exceptions had been taken before the instructions had been given to the jury.

In view of said stipulation, plaintiff is in no position to urge as error that which he might have been called upon to do had the verdict been the other way and plaintiff instead of defendants desired a record for appeal.

For the errors pointed out, the judgment is reversed and the cause is remanded, with directions to grant the defendants a new trial.

BAYLESS, C. J., WELCH, V. C. J., and HURST and DAVISON, JJ., concur.