Sunray DX Oil Co. *v.* Thurman.

5-3395             384 S. W. 2d 482

Opinion delivered December 14, 1964.

*Keith, Clegg & Eckert, M. Darwin Kirk, J. P. Greve* and *Ben Hatcher,* Tulsa, Okla., for appellant.

*Chambers & Chambers,* for appellee.

Carleton Harris, Chief Justice. Appellee was the owner of a certain forty-acre tract located in Columbia County. On September 15, 1958, Shell Oil Company, which held an oil and gas lease covering said land, assigned the lease to Sunray DX Oil Company, appellant herein. The lease recites that it is given to the lessee "for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon

to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such operations conducted by lessee thereon, * * *'' On May 21, 1963, appellee instituted suit against the company, seeking damages in the amount of $6,500.00 ($4,000.00 actual and $2,500.00 punitive), alleging that her land had been permanently injured because of the fact that appellant had deliberately, and by negligent acts, dumped salt water and waste oil on the land, and had permitted salt water to flow upon it, with full knowledge that the salt water was a poinsonous substance, and would kill and destroy vegetation; that these substances did destroy all vegetation. Appellant answered, denying the allegations of the complaint, and denying any improper use of appellee's land. It was further asserted that if appellee had any cause of action, such cause was barred by the statute of limitations. The case proceeded to trial, and at the conclusion of appellee's evidence, appellant moved for a directed verdict, contending that the evidence was insufficeint to establish a cause of action, and further, that the action was barred by the three-year statute of limitations. The court overruled the motion, and appellant declined to offer any evidence, standing on the motion for a directed verdict. After receiving instructions, the jury retired, and returned a verdict in the amount of $2,000.00, with interest at 6% per annum. From the judgment entered in accordance with the verdict, appellant brings this appeal.

During the oral argument, it was pointed out that the testimony reflected that producing oil wells had been located and developed in the center of each of the ten-acre tracts of the forty acres. The four wells were operated from a unit located in the center of the forty-acre tract, and the fluid content from each of the four wells was pumped to a large metal tank (called separator) near the center of this forty acres. The salt water was

"bleeded" from the tank to an earthen pit, which had been dug also near the center of the tract. Salt water was then pumped from the pit to a disposal well located on another tract of land.

According to appellee's evidence, the earthen pit was low in one place, which permitted the salt water to overflow, and this overflowing particularly occurred when it rained. Appellee's contention was, and is, that the salt water overflowed from the pit to the surrounding land, destroying valuable timber, and making the land unfit for further agricultural use.

For reversal, it is first asserted that appellee's claim is barred by the three-year statute of limitations. In raising this point, appellant makes a two-pronged attack. First, it is pointed out that if the pit were of a permanent character, and its construction and continuance were necessarily an injury, the damage was original, *i.e.*, the very nature of the construction made evident the fact that damage would occur, and compensation should have been sought at once. If such were the case, the statute of limitations began to run upon the construction of the pit, and suit was not instituted within the statutory period. Appellant has stated the law correctly, and we have so held numerous times. See *St. Louis Iron Mountain & Southern Railway* v. *Biggs,* 52 Ark. 240, 12 S.W. 331; *St. Louis Iron Mountain and Southern Railway Company* v. *Anderson,* 62 Ark. 360, 35 S.W. 791; and *Brown* v. *Ark. Central Power Company,* 174 Ark. 177, 294 S.W. 709. These holdings are not applicable to the case before us, however, nor does appellant vigorously argue that this type of construction was such as to constitute an injury from the time the pit was originally dug on the premises. The pit itself was not the cause of the alleged damage sustained; rather, the fact that it overflowed, spilling the salt water onto the lands, occasioned appellee's complaint. But appellant does argue with vigor that the statute of limitations began to run more than three years before the institution of the suit. The complaint was filed by appellees in May, 1963, and appellant,

in making its argument, refers to the fact that there was testimony of damage to the lands in question in 1959. It is true that there was some testimony that damage was discovered in 1959. W. H. Thurman, son of appellee, testified that every time it rained, the pit overflowed, the salt water spreading in every direction, except south, killing timber and vegetation near the center of the forty acres; that damage occurred in 1959, and increased in 1960. W. E. Thurman, a grandson of appellee, testified that the salt water began to damage the land around the pit in 1959. "Then it started easing on out * * * every time it would rain more it would go on out further * * *." H. D. Thurman, another son of appellee, testified that while there was damage in 1959, it constantly grew worse, "along about '61, along through the winter was when the pits overflowed so and the summer of '61 was when it killed so much vegetation there." Kennith Gray stated that in 1959 he noticed some leaves dying, that the damage grew successively worse, and "* * * it had got to where several of the big trees were dying." It is thus evident that there was testimony as to damage in 1959, 1960, and 1961. It was a jury question as to when the land in question was *permanently* damaged. *Missouri Pac. R. Co.* v. *Horn,* 121 S.W. 2d 102; *Moore* v. *Charles F. Luehrmann Hardwood Lumber Company,* 82 Ark. 485, 102 S.W. 385. In the latter case, we said:

"The next alleged error is as to the statute of limitations. There was a dispute as to whether the timber was cut in 1901 or 1900. That issue was properly sent to the jury, and its finding is conclusive."

In *H. F. Wilcox Oil & Gas Co.* v. *Juedeman,* 101 P. 2d 1050, the Oklahoma Supreme Court stated:

"It seems well settled that in an action for damages for permanent injury to real estate caused by continuing salt water pollution the limitation begins to run at the time when it becomes obvious that a permanent injury has been suffered."

It is next asserted that there is insufficient proof of wrongful operations, and no proof of negligence. Appellant contends that it had the right to go on the land and do all things necessary and incidental to drilling, operating, and maintaining the wells for the production and marketing of oil, and that it is only liable for wanton or negligent destruction, or liable only for damages to that portion of the land that was not reasonably necessary for the oil operations. From appellant's brief:

"Plaintiff nowhere alleges that defendant used more land than was reasonably necessary to do the things defendant had a right to do under its lease. Plaintiff complains of salt water and waste oil being dumped or permitted to flow upon her land. Plaintiff does not allege that said salt water or waste oil traveled beyond the areas necessarily required by defendant for its oil operations under said lease. Plaintiff does not allege specific acts of negligence. Plaintiff does not allege how many acres of land were injured, or how many acres were reasonably required for defendant's operations. Plaintiff does not specifically allege what defendant could have done to correct the situation, or whether it was possible, under the existing circumstances, to have made such correction. Plaintiff also failed to supply such deficiencies by proof."

We do not agree with this argument. Appellee's testimony showed that an area consisting of five or six acres in the center of the forty was damaged. We are unable to understand appellant's statement: "*Plaintiff does not allege that said salt water or waste oil traveled beyond the areas necessarily required by defendant for its oil operations under said lease.*" Appellant seems to indicate by the italicized statement that, as a part of its normal operations, it was entitled to permit the salt water to travel over some part of appellee's lands, but we do not concur with this view. Was it necessary that the salt water travel over the land at all? How did it help appellant's oil operations for the salt water to overflow the pit? We cannot agree with appellant's state-

ment that negligence has not been shown, for the evidence reflected that one side of the pit was low (whether from faulty construction or erosion is not shown), and this permitted the salt water to overflow, and, particularly so, during rainy periods. There was also evidence that the percentage of salt water continued to increase, until, in fact, the wells were shut down. Nonetheless, appellant apparently[1] made no repairs to the pit, and the damage continued to increase.

The Arkansas Legislature of 1957 recognized the dangers of salt water by enacting Act 381 of 1957. That act (Ark. Stat. Ann. 53-211 and 212 [Supp. 1963]) makes it "mandatory that salt water produced from any newly discovered oil and/or gas field, commencing with July 1, 1957, be disposed of by the producer of said salt water by either putting it in pits or re-cycling it back into the proper sand." A fine ranging from $100.00 to $1,000.00 is provided for those who violate the provisions.[2]

Finally, it is asserted that appellee has not properly established her damages. W. H. Thurman testified that he went over the property in May, 1960, and he valued same at $4,000.00. He then testified that the sale value of the property in May, 1963, was $2,000.00. Fred W. O'Bier, a real estate dealer, testified that he was familiar with appellee's property, and had handled property sales in the general area; that, in his opinion, the forty acres would have been worth $200.00 an acre in May, 1960, or a total of $8,000.00, but was only worth $100.00 an acre in 1963, or a total of $4,000.00. We have held that where there is permanent damage to real property, the measure of damages is the difference in market value before and after the injury. See *Benton Gravel Company* v. *Wright*, 206 Ark. 930, 175 S.W. 2d 208, and cases cited therein. See also Volume 4, Summers Oil and Gas, Chapter 21, Section 658, Page 88. Appellant contends that the witnesses should have testified more specifically, and in

---

[1] As previously stated, appellant introduced no testimony.

[2] This act, of course, has no application to the instant case, since this operation commenced before the effective date of the act.

more detail, as to how they reached these figures, but these facts could have been ascertained on cross-examination. Counsel did not interrogate Thurman on this point, and did not cross-examine O'Bier at all. Of course, damages of this nature are difficult to establish to an exactness, but the testimony reflected that the five or six acres in the middle of the forty-acre tract were permanently damaged, all vegetation and timber dying, and the witnesses appeared qualified to express an opinion as to the effect the damage to this acreage had on the entire forty.

Affirmed.