CITY OF SPRINGDALE, ARK. *v.* SAM WEATHERS ET UX

5-4047                                          410 S. W. 2d 754

Opinion delivered January 16, 1967
[Rehearing denied February 20, 1967.]

*Little & Enfield* and *Crouch, Blair & Cypert,* for appellant.

*Putman, Davis & Bassett,* for appellee.

PAUL WARD, Justice. This litigation concerns damages to a dairy farm caused by the discharge of sewage

from a disposal plant owned by the City of Springdale. The sewage polluted Spring Creek which ran through appellees' farm, allegedly causing permanent damage to its use as a dairy farm.

On December 30, 1963 appellees, Mr. and Mrs. Sam Weathers, filed suit against appellant, City of Springdale, asking for damages in the sum of $175,000. On December 15, 1965, after a lengthy trial to a jury, judgment was entered against appellant and in favor of appellees in the amount of $38,000, and this appeal by appellant follows. Pertinent testimony will be referred to hereafter in the assignments of error. For a reversal appellant relies on the following points:

### 1.
The court erred in failing to direct a verdict in favor of the defendant on the grounds that the plaintiff's cause of action is barred by the statute of limitations.

### 2.
There was no substantial evidence upon which to base a finding of damage, and the award of damages was grossly excessive.

### 3.
The court erred in failing to give an instruction on temporary damages as requested by the defendant.

### 4.
The court erred in allowing hearsay evidence into testimony, to the prejudice of defendant.

1. After an examination of the pertinent legal issues and testimony involved we have concluded no reversible error is shown under this point.

It is apparently agreed by both parties that the three years statute is applicable here. There is, however, a sharp conflict in opinion over when the statute begins to run. Generally speaking, it is the contention of ap-

pellant that the statute begins to run "upon the construction of the nuisance", quoting from the case of *St. Louis Iron Mountain & Southern Railway Company* v. *Anderson,* 62 Ark. 360, 35 S. W. 791. Again, appellant says "the injury dates from the construction of a permanent sewage disposal structure", citing *Sewer Improvement District No. 1 of the City of Wynne* v. *Fiscus,* 128 Ark. 250, 193 S. W. 521, and *International Shoe Company* v. *Gibbs,* 183 Ark. 512, 36 S. W. 2d 961. It is then pointed out by appellant that the record shows, among other things, that: The City had a disposal plant in 1937 by which Spring Creek was polluted in some degree; appellants bought part of their land in 1946 and the rest of it in 1959; appellees received from the State Health Department a permit to operate a Grade A Dairy in 1957; City built a new disposal plant in 1964 (after this suit was filed) to correct the trouble; appellees had to quit irrigating their land with water from Spring Creek because of pollution of the water, and; during all periods above mentioned the creek was being noticeably polluted. It is, therefore, earnestly insisted by appellant that since appellees were aware of the above factual situation their cause of action arose more than three years before suit was filed by appellee in December 1963.

In our opinion the rule applicable to the facts in this case relative to when the statute began to run is the one set out in *Sunray DX Oil Co.* v. *Thurman,* 238 Ark. 789, 384 S. W. 2d 482 and *Nance* v. *Cook,* 240 Ark. 336, 399 S. W. 2d 262. In the *Sunray* case we approved the following statement:

" 'It seems well settled that in an action for damages for permanent injury to real estate caused by continuing salt water pollution the limitation begins to run at the time when it becomes obvious that a permanent injury has been suffered.' "

We infer appellant contends that the rule announced in the above cited cases is not applicable here because

they deal with damage by salt water and not by sewage. Such distinction is not supported by sound reasoning or by our decisions. The nature of damage to land is so similar in both instances, that, we think, the same rule should be followed in attempting to determine the time when the permanent injury occurred. In the *Nance* case we approved the same statement copied above.

There are, therefore, two fact questions for the jury to decide; (a) whether the damage was permanent, and (b) if so, when did it become, or should have become, obvious to appellees. Both of these fact questions were presented to the jury on separate interrogatories. The jury found from the evidence that the farm had been permanently damaged and that it became obvious to appellees in the year 1963.

It would serve no useful purpose, we think, to detail all the testimony relative to the above mentioned questions since we have carefully read the same and find substantial evidence to support the findings of the jury. It suffices to point out that there was testimony showing the contamination began (in a slight degree) in 1937; that it continued to increase until 1961 when the City agreed to stop it after appellees had spent thousands of dollars on improvements to make a Grade A dairy farm; that the contaminations continued until appellees were informed by the State Health Department to stop or materially curtail such operations on December 9, 1963.

2. We also are convinced there is substantial evidence in the record to sustain the jury's finding that appellees' farm was damaged to the extent of $38,000. It is properly conceded by both parties that the amount of damages is the difference between the value of the farm before and after the damage.

In substance, Mr. Weathers testified: I bought an irrigation system to use water from Spring Creek; in

1952 I built a Grade A. Dairy barn in order to be able to run a Grade A. Dairy farm; in 1957 I built a bottling plant to pasteurize and homogenize the milk, all in compliance with the rules and regulations of the State Health Department, and I have made other improvements; at times the odor from the creek was unbearable; I received a letter from Dr. Dick (director of the milk division of the Arkansas State Health Department) cutting me off from my land so I could no longer carry on a Grade A Dairy operation, and; in my opinion the value of my land as a Grade A Dairy was $170,000 and is now worth about $70,000. Mr. Emmory Grose, a real estate appraiser living in Fayetteville with eight years experience as an appraiser for the Federal Housing Administration, testified that the market value of appellees' farm was worth $140,000 before the damage but that it is now worth only $66,000. Appellant objects to the testimony of Mr. Weathers on the ground that he gave no basis for the values he fixed, but we held in the case of *Housing Authority of the City of Searcy* v. *Angel,* 239 Ark. 224, 388 S. W. 2d 394, that a property owner who had lived on a piece of property for a long time "is qualified to give his opinion as to the value of the property both before and after a portion has been taken in a condemnation proceeding, and in this case we cannot say that such evidence is not substantial as to the damages sustained". Also, we think Mr. Weathers did give some very good reasons to explain the extent of his damage.

3. We fail to see any error in the trial court's refusal to give appellant's instruction on temporary damages. In the first place, appellees' suit was based solely on permanent damages, and appellant's answer on this point was a general denial. In the second place, the jury's verdict excludes any possibility of temporary damages. Also, appellant cites the *Anderson* case, supra (and other cases), to show that a damage of this nature is permanent and not temporary.

4. When Mr. Weathers was recalled as a witness

he was asked about certain instructions he had received from Mr. Dick (Director in the State Board of Health).

Q. "Did you ask him (Dick) whether or not you could raise feed and feed it to your cattle down there?"

A. "Yes . . . ."

Q. "What did he tell you?"

A. "He said I could not do it."

Q. "What about pasturing your cattle down there that were dry?"

A. "I couldn't do that either."

The above was objected to as hearsay evidence.

For several reasons, we are of the opinion that no reversible error was committed by the trial court in admitting this testimony.

In the first place the testimony was cumulative, it already having been established that appellees could not operate a Grade A. Dairy because of the permanent injury to his farm. It could only tend to prove appellees might use some of the land for general farm purposes —a fact which had been admitted by appellee. Also, Dr. Dick testified that he had visited the farm twice and had told Mr. Weathers that the existing condition was "a violation of the Grade A regulations", and that his "permit" would be cancelled. In addition to the above we feel that, under the facts revealed by the testimony in the record, the testimony elicited from Weathers relative to his conversation with Dr. Dick was not for the purpose of proving any material issue in the case but merely to show Weathers had received certain instructions from Dr. Dick (a public official) which he was compelled to follow if he continued to run the dairy. In the case of *Motors Insurance Corporation* v. *Lopez,* 217 Ark. 203, 229 S. W. 2d 228, where a similar issue was raised, we find this statement:

"A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial."

Undoubtedly it was relevant here for appellees to show what instructions he had received from the State Health Department.

If, therefore, this testimony was admissible for one purpose but not admissible for another it was incumbent upon appellant to request the court to so instruct the jury. A general objection to the testimony was not sufficient. See: *Bodcaw Lumber Co.* v. *Ford,* 82 Ark. 555, 102 S. W. 896; *Sterling Stores, Inc.* v. *Martin,* 238 Ark. 1041, 386 S. W. 2d 711, and; *Finley* v. *Smith,* 240 Ark. 323, 399 S. W. 2d 271. Appellant made no such request in this case.

Finding no reversible error the judgment of the trial court is affirmed.

Affirmed.

Brown, Fogleman & Jones, JJ., dissent.

John A. Fogleman, Justice, dissenting. While the cases cited by the majority to support their position as to the time of accrual of the cause of action in a case such as this are in tort, based on negligence, I concur in their position as to the beginning of the running of the statute of limitations, *i. e.,* at the time when it can be ascertained with reasonable certainty that pollution of the stream will result in a nuisance of a permanent and continuous character, as this indicates an intention to take a permanent right to so pollute the stream. See *McLaughlin* v. *City of Hope,* 107 Ark. 442, 155 S. W. 910; *El Dorado* v. *Scruggs,* 113 Ark. 239, 168 S. W. 846; *Sewer Improvement District No. 1 of Wynne* v. *Fiscus,* 128 Ark. 250, 193 S. W. 521.

I see no reason why the same rules governing the accrual of the cause of action for permanent damage applied in tort actions should not also be applied when the permanent damage to the realty is the result of the exercise of the power of eminent domain. Cases decided by this court in which damages were sought by reason of eminent domain have been cited as authority in opinions on appeals where recovery was asked because of permanent damage for tortious action polluting a stream. See, for example, *International Shoe Company* v. *Gibbs*, 183 Ark. 512, 36 S. W. 2d 961.

It is true that the cause of action sometimes accrues when a sewer plant is constructed, as when the design and construction is of such type or nature as to make permanent damage to the land of a lower riparian owner inevitable, as in the *McLaughlin* and *El Dorado* cases. But in this case there is substantial evidence to indicate that, in 1937, when this stream was first used as an outlet, no one would have foreseen any pollution or permanent damage to lower riparian owners and an action by the then owners of the Weathers lands would seem to have been, even in retrospect, inevitably unsuccessful. There is substantial evidence in this record from which the jury might have found that appellees' right to compensation accrued within three years prior to the date of taking, but there is no substantial evidence to support the finding that the "permanent damaging" was in 1963. This record clearly shows that the permanent damage from which the intention to take is inferred was sometime in the period from 1953 to 1962. In considering this facet of the case it must be remembered that the action of the Fluid Milk Control Division of the State Board of Health in December of 1963 does not in any way indicate that this was the date of "taking". This is simply the time when the Director of that division discovered the situation. The resulting action closing the Grade A operation was not the exercise of the power of eminent domain by the city, nor was it evidence thereof, but it was the exercise of the police power of

the State of Arkansas. It must also be remembered that Dr. Dick, the Director of the Division, would not have permitted this dairy operation at any time when the discharge from the Springdale sewer system ran into Spring Creek, regardless of the efficiency of the plant and its operation and regardless of the purity of the water in the stream.

A brief review of the testimony will illustrate the reason for my dissent from the holding of the majority. Appellee Sam Weathers testified in part, in substance:

There was no obnoxious odor and nothing to alert me of the receiving of sewerage when I acquired the first part of the property in 1946. In 1951 I began to use the water for irrigation and my dairy cattle used the creek for water. In 1953 the condition of Spring Creek began to change with the first thing we noticed being an odor and an off color. The pollution worsened constantly until I began to notice dead fish about two years later. When it first started we had about two months in the Fall at the lowest flow and the rest of the year was comparatively clean. The period during which the contamination was obvious began to increase until *in about* 1961 *when we filed our injunction against the City of Springdale it was a twelve-month situation.* The odor from my house was unbearable and the cows quit drinking from the stream and they wouldn't even cross it without forcing them. I couldn't irrigate from the stream beginning in 1959 because it was so badly polluted. I did make complaints to the City of Springdale in 1952 or 1953 and in the middle nineteen fifties. They did build a new plant in 1957 and after that I filed an injunction suit which ended in a consent decree. It was as bad after they built the new plant as it was before. Under the conditions that prevailed in my dairy in the years 1962 and 1963, I was not getting maximum utility out of my cows and equipment. The situation got worse

and reached its culmination in 1961 when I sought the aid of an attorney.

While there was other testimony, none of it supports the jury finding as to the year 1963, even though it is true that one Jack Benton, called by appellees, testified that Mayor Davis of Springdale told him the city had been ordered by the Health Department to buy four miles of land down the creek, and that they had made a deal in February of 1963. This was hearsay admitted over the objection of appellant. He also said that the stream was unusable for him from 1956 on, and the condition on the Sam Weathers property was the same as on his. Mayor Davis did state that the Benton land was acquired and that the Health Department had required the city to buy lands one and one-quarter miles downstream for the sole purpose of additional oxidation ponds.

The finding of the jury was based upon an instruction of the court to the effect that permanent damage occurred when the contamination and pollution existed to the extent of denying the landowners the use of the lands for which they were intended and adapted, over the objection of the appellant. The court then submitted an interrogatory to the jury asking them to find the year in which the city permanently damaged the land. I feel that this instruction was inherently erroneous in that the permanent damage occurred when it could have been ascertained with reasonable certainty that there would be contamination and pollution which would result in a nuisance of a permanent and continuous character such as would deny the landowner the use of the lands for which they were adapted so as to affect the market value thereof.

In all other respects I concur with the majority. While appellant did not specifically list the lack of substantial evidence to support the 1963 "date of taking" as a point to be relied upon in its original brief, it did list the failure of the trial court to direct a verdict, urg-

ing that there was no substantial evidence to support a finding of a date of taking at any time within three years next preceding the filing of the complaint. Appellant then specifically argues the objection to the instruction on the ''date of taking''.

Although the pleadings were not before the jury, it is not insignificant that in response to a motion to make the complaint more definite and certain, appellant alleged a date of taking in October, 1961. A second amendment to the complaint might be construed to allege a date of taking in 1954.

While it could be urged, with some justification, that there is still substantial evidence that the permanent damage occurred at some other time within three years next preceding the filing of the complaint, still this question was not submitted to the jury. Its finding as to the year the permanent damage occurred, based on the erroneous instruction, makes the conclusion that the jury based its finding on the action taken by Dr. Dick, rather than on the acts of appellant, inescapable.

I, therefore, respectfully dissent from the holding of the majority and I would reverse and remand for a new trial.

I am authorizd to state that Justice Brown joins in this dissent.