Jack WHITMORE *v.* STATE of Arkansas

CR 77-126                                      565 S.W. 2d 133

Opinion delivered May 8, 1978
(Division II)

*John Barry Baker*, Public Defender, for appellant.

*Bill Clinton*, Atty. Gen., by: *Robert J. Govar*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant, who was found guilty of the crimes of carnal abuse in the first degree and rape, challenges the judgment of conviction on two grounds. He contends that the trial court erred in overruling his motion to suppress an incriminating statement made by him and that the evidence was insufficient to support the verdict on the charge of rape. We find no error and affirm.

The basis for his argument relating to the motion to suppress is that the trial judge failed to adequately weigh the multitude of factors surrounding the giving of his statement. The factors, or facts, which appellant contends indicate improper conduct which served to exert undue influence on his free will and resulted in a coerced and involuntary statement, which he emphasized in his brief, may be summarized thus: fear of the police; his inexperience in contacts with and observation of police officers; methodical reading by police officers of "Miranda" warnings in an automaton fashion; failure of the police to ask if he wanted to see an attorney until he had been "booked in" after giving two statements; his anxiousness to complete the statements so he could return an automobile to his brother who had to go to work; intimidation by Officer Coffman of the Criminal Investigation Division of the Fayetteville Police Department; implied promises of leniency by Coffman; the absence of two police officers who had been present during the taking of appellant's first statement while Coffman was coercing appellant to give a second

statement; failure of the police to use tape recording equipment; conflicts in the testimony relating to the police officers who were present when appellant's second statement was given; and his state of shock at having been placed in a jail cell before he inserted an additional sentence in his second statement.

It might well be that if the existence of all those factors was beyond dispute, and no others were involved, we should say that the statement was involuntary. But we must make an independent determination of the voluntariness of the statement based upon the totality of the circumstances, reversing the finding of the trial court only if it is clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515.

Appellant was a physical education instructor at Bates Elementary School in Fayetteville, where he was attending the University of Arkansas. He was 19 years of age. He was accosted at about 10:30 or 10:45 a.m. on August 25, 1976, at a sporting goods store by Sgt. Bill Brooks of the Fayetteville Police Department, Investigator Doug Fogley of the Arkansas State Police and Officer Coffman. They asked him to come with them to the police station. The officers testified that they told Whitmore that there had been allegations accusing him of indecent acts and related some of the conversations about these acts while on the way to the police station. Whitmore was taken to the criminal investigation office of the Fayetteville Police Department, where he was advised by the officers that he had been accused by the parents of two young males regarding his sexual involvement with these youths and that these officers were investigating these charges. There is little room for doubting that Whitmore was fully informed about the charges that were under investigation.

Whitmore admitted that one of the officers read "some rights" to him at an office at the police station, but said that he could not recall what they were, because he was in a hurry to return the automobile in which he had gone to the sporting goods store to his brother who was supposed to be at his place of employment at 11:00 a.m. He acknowledged that he had signed a waiver of rights. Officers Coffman and Fogley

testified that this instrument contained a recitation of his rights and his recorded acknowledgement of his understanding of them made after Fogley had gone over each of them with him in detail. They said that this was done as soon as they all arrived at the police station and went into the criminal investigation division office. Brooks was not present at this time but was present when Whitmore's statements were made.

Whitmore testified that he signed two or three papers, but when the officers were reading, his mind was "off," thinking of the trouble he was in and of getting the car home. He couldn't say that he made the responses shown as recognition of his understanding of his rights and couldn't say that he didn't. He could not be sure whether the officers told him about his right to have a lawyer present, but was positive that none of the police officers asked him if he wanted to call a lawyer or if he wanted to call anyone. He denied knowing what "right to waive" meant, but said that he knew that waive meant to give up the right and that he thought it means "just that you give up the right if you start talking to them." He admitted that he understood two or three of the rights. He said that he had not read any of the two or three papers he signed and thought the officers told him to look them over and sign them, but couldn't remember them telling him to read any of the several "pieces of paper." In spite of his saying that he signed these papers readily because he was trying to get the car back to his brother, he later said that he thought that the officers were going to put him in jail when they first came up to him and said something about a delicate matter down at the school. When asked about specific items in the first statement, made in the presence of all three officers, he could remember having made practically all the non-incriminating statements attributed to him, saying that they were made in response to specific questions by the officers; however, he denied having made any statement that tended to be incriminating. He not only admitted that the signature and date at the end of the page were in his handwriting, but admitted having signed this statement; however, he denied having read it, saying that the officers had told him to look it over and sign it.

Whitmore thought he had signed a second, more incriminating statement. He said that this statement was made to Officer Coffman, after Brooks and Fogley had left the room to get some coffee. He said that after they left, Coffman shut the door, got up on the desk, pounded on it, demonstrated what he thought of the first statement by throwing it in the trash and said, "I want another story right now. You are not going to leave here until I get it. I want another, because everything you said in there — wasn't any of it true." Whitmore said that Coffman had said that if he made the statement he could go home and Coffman would just put it in the file, and it never would get to court. Whitmore said that his main objective had been to get out of the office, because he was already late, and that he had understood Coffman to mean, although Coffman had not said so, that if he explained exactly what happened to those kids at what times, he could leave. Again Whitmore could recall the less incriminating portions of this statement, which was typed by Coffman, who was asking Whitmore questions as he went along. Whitmore either denied or could not remember making the incriminating ones. He admitted that the typed statement bore his signature, but said that he could not remember placing it there, that he had never seen the statement until shown it by his attorney in the attorney's office and that when Coffman had quit typing, the other officers had come in and Coffman had said, "Well, I finally got a statement out of him." Whitmore said that the officers then placed him in a jail cell and he went into shock. Because of this he said that he could not remember writing a sentence interlined in the second statement and did not remember seeing it until he saw it in his lawyer's office, although he admitted that it appeared to be in his handwriting.

Whitmore testified that he had been so frightened when the officers came up and started talking to him that he was shaking all over and "almost passed out." On the other hand, Officers Coffman and Brooks, when called as witnesses for appellant, testified that Whitmore seemed about as nervous or apprehensive as any person would be when confronted with being taken to the police station or informed of accusations of this nature.

The evidence on behalf of the state was quite different

from that of Whitmore in many respects. Even Whitmore admitted that the Officers Brooks and Fogley were courteous to him, except for using profanity and that Coffman was the only one who gave him "a bad time," referring to what he said took place between the two statements in the absence of Fogley and Brooks. Coffman and Brooks both testified that Coffman fully advised Whitmore of his rights when he entered the police car and that Whitmore made no comment. Coffman, Brooks and Fogley all testified that Fogley reviewed the "Miranda" rights with Whitmore as soon as the parties went into the criminal investigation office. They also said that before Whitmore was ever questioned, he had signed a record showing his affirmative answers to separate questions as to whether he understood each of his rights. At this time, according to Coffman, Fogley elaborated upon the accusations against Whitmore, giving him the names of the complainants, the parents of the youths said to be involved and asked Whitmore if he desired to give his side of the story, saying that children sometimes made allegations against adults that are untrue. Whitmore's statement was then recorded by Fogley as given by Whitmore, largely in response to questions by Fogley, according to all three officers. This statement, they said, was completed about 15 or 20 minutes after the explanation of rights.

All the witnesses agree that Brooks and Fogley left the office to go get coffee after the first statement was signed and that they were absent for 15 or 20 minutes. Coffman's version of what happened during these few minutes was quite different from Whitmore's. Coffman testified that he had stated that he did not believe the entire statement, and that he felt that Whitmore had left out part of the incidents and that he did not think Whitmore was telling the entire truth. Coffman also testified that he told Whitmore if the case went to trial and it was proven that he had lied in his statement or in any statement he made in court, it would look bad to the judge and jury, and, if he was going to admit being in a compromising situation with these boys, he should either tell the truth or make no statement at all until he talked with an attorney, because his life could be ruined. Coffman said that he also told Whitmore that the statement he had made, or any statement he made, would be presented to the prosecuting attorney's office, and that the prosecuting attorney would

decide whether there was sufficient evidence to file charges. Coffman related that Whitmore at first said that his statement was correct and that he had not left anything out, but later admitted that he had left out certain aspects of the incidents and agreed to give a different statement. Coffman stated that he questioned Whitmore about his involvement in the allegations made by the alleged victims and that Whitmore had made several statements when Fogley and Brooks returned to the room and were advised by Coffman that Whitmore desired to change his statement. According to the testimony of the three officers, a new form was used by Coffman, who typed Whitmore's statement on it. Coffman testified that Fogley read this statement to Whitmore and that Whitmore agreed to it. Coffman said it was then handed to Whitmore, who signed it, after having appeared to have read it and having initialed typing errors at Coffman's request. Furthermore, Coffman testified that, before Whitmore made his second statement, Coffman had handed him the form on which the statement was later recorded, stating that he was again advising Whitmore of his rights and asked him to read the form on which a recitation of his rights was printed. Coffman said that Whitmore had read the statement which included an acknowledgment that he understood it and signed it.

Fogley testified that, after the second statement was completed and signed and Whitmore placed in a jail cell, an omission was discovered and that he and Brooks went to the cell, where Fogley asked Whitmore about the omission, inquired whether it was all right to insert the matter omitted, and, when Whitmore said "okay," asked him to write it in and initial it. This was the only part of this statement that was handwritten.

Coffman admitted that the father of one of the alleged victims was an investigator for the University of Arkansas Department of Public Safety and a personal friend with whom he had had many contacts.

The trial judge, in holding the statement voluntary, emphasized the education, academic record and occupation of Whitmore, his clear understanding of the meaning of "waiver," and the unlikelihood that such a person would

have any difficulty in understanding any of the words in which the written explanation of his constitutional rights were couched. The trial judge noted that there were conflicts in some of the testimony.

In viewing the trial judge's findings, we must, as in every case where witnesses testify before him, defer to his superior position for judging the credibility of witnesses. See *Holloway v. State*, 260 Ark. 250, 539 S.W. 2d 435, rev'd. on other grounds, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); *Johnson* v. *State*, 249 Ark. 268, 459 S.W. 2d 56; *United States* v. *Thomas*, 521 F. 2d 76 (8 Cir., 1975); *United States* v. *Davis*, 532 F. 2d 117 (8 Cir., 1976). In considering this matter and giving due deference to the fact that the trial court obviously resolved the questions of credibility against appellant, we find that there are appropriate bases for doubting Whitmore's credibility. For example, the statement that he could not think of anything that disturbed his mental processes during the two or three hour period involved in the taking of the statements except that he was in a hurry all morning because he wanted to get the car back to his brother. This is a rather implausible explanation for the failure of one with appellant's education, faced with the serious charges of which he was told, to give attention to the explanation of his rights to remain silent, to have the assistance of counsel, etc., and to grasp their meaning.

Appellant has asserted that in considering the questions pertaining to the voluntariness of the statement, we should consider the testimony of character witnesses who testified in regard to his reputation for truthfulness at the trial. These witnesses did not testify at the suppression hearing. Even though it was necessary for the trial judge to make evaluations of the credibility of witnesses testifying at the hearing on the motion to suppress, he certainly could not be expected to do so on the basis of testimony he had not heard. On appellate review on questions of admissibility of evidence, the trial court cannot be held in error on the basis of evidence adduced after his ruling is made. *Barnard* v. *Keathley*, 249 Ark. 346, 459 S.W. 2d 121. See also, *Maurice* v. *Hunt*, 80 Ark. 476, 97 S.W. 664. In this case, there was no renewal of the objection to the introduction of the confession or motion to strike it after these witnesses testified.

Appellant also contends that the evidence was insufficient to support the verdict on the rape charge. He was charged with having committed the crime of rape on August 7, 1976, by engaging in deviate sexual activity with Brian Burkhalter, who was then less than 11 years of age. In the context of this case, deviate sexual activity is defined as any act of sexual gratification involving the penetration, however slight, of the anus of one person by the penis of another. Ark. Stat. Ann. § 41-1801 (Repl. 1977). Appellant contends that there was no substantial evidence to show that the crime of rape had been committed, i.e., that there had been any penetration of the anus of Burkhalter by the penis of Whitmore. Since there was a confession, the evidence was sufficient, if evidence other than the confession showed that the crime was committed. Ark. Stat. Ann. § 43-2115 (Repl. 1977); *Mosley* v. *State,* 246 Ark. 358, 438 S.W. 2d 311; *Pigg* v. *State,* 219 Ark. 879, 245 S.W. 2d 209.

Brian Burkhalter testified that he spent the night at Whitmore's apartment and slept in the bed with Whitmore. He said that Whitmore gave him some Sleep-Eze pills, saying that they would help him sleep better. Brian testified that, for some reason, he had to get up in the middle of the night because he felt something funny, like grease, coming out of his rear end, so he went to the bathroom and cleaned it off the best he could. This substance, he said, was white and transparent, similar to Vaseline. Brian said that he went back to bed and went to sleep and the same thing happened again, so he got up, because he again felt like he had to go to the bathroom. He said that Whitmore was lying behind him and facing toward him. He said that when he got up, Whitmore threw the covers down. Brian stated that when he went to the bathroom, he found the same thing he had found before. According to the boy, it was then 6:00 a.m. and he called his father by telephone and then rode his bicycle home. He stated that occurrence took place in June or July, but he could not be more specific than to say that it was the last time he spent the night with Whitmore. Brian's mother testified that the last time Brian had spent the night with Whitmore was August 7, 1976.

Our decisions have supported the view that penetration in a rape or sodomy case can be shown by circumstantial

evidence. *Needham* v. *State*, 215 Ark. 935, 224 S.W. 2d 785; *Hudspeth* v. *State*, 194 Ark. 576, 108 S.W. 2d 1085. See also, *Leasure* v. *State*, 251 Ark. 887, 475 S.W. 2d 535; *Havens* v. *State*, 217 Ark. 153, 228 S.W. 2d 1003. The new definition and consolidation of these offenses does not mandate any change. The circumstantial evidence here was sufficient to sustain the verdict, as it gave rise to more than a mere suspicion, and the inference which might reasonably have been deduced from it would leave little room for doubt.

The judgment is affirmed.

We agree. GEORGE ROSE SMITH and HOLT and HICKMAN, JJ.