Johnnie Lee CHISUM *v.* STATE of Arkansas

CR 80-213                                    616 S.W. 2d 728

Supreme Court of Arkansas
Opinion delivered May 26, 1981
[Rehearing denied June 29, 1981.]

2

*Gardner & Gardner*, for appellant.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Between 7:00 and 8:00 on the morning of April 9, 1978, Roger Rackley was shot in the chest while he was in a garage in the home of the appellant's sister, Alta Garrison, at Hector in Pope county. An ambulance was summoned at once, but Rackley died before he could be taken to a hospital. The appellant, Johnnie Lee Chisum, was charged wth second degree murder committed with a firearm and was found guilty of manslaughter committed with a firearm. In appealing from a verdict and judgment sentencing him to confinement for 14 years he argues five points for reversal.

Certain basic facts are not in dispute. Mrs. Garrison, with two other women, was at home when Chisum and Rackley came to the house at about 7:00 a.m. The two men had been drinking and were arguing with each other. After a while both men went into the garage through a connecting door, which one of the women locked behind them. None of the women testified to having heard a shot. In about 15 minutes, however, Chisum beat on a different door, was admitted, and said: "I need help. Roger has been shot." Rackley was found lying in the garage with a bullet wound in his chest. An ambulance and the police arrived shortly, but Rackley lived only a few minutes.

4

Two state policemen and the sheriff took a statement from Chisum, at the scene. They testified at a Denno hearing that Chisum was warned of his rights before he signed a waiver form. They realized Chisum had been drinking, but they testified he was capable of making a statement and did so. In the oral statement, as later narrated to the jury, Chisum said that he and Rackley had been up all night. They had ridden around together and done some drinking. At one point they went to Rackley's house to get two shotguns, to go hunting. They wound up at Alta Garrison's house, where they went in, took off their boots, and drank coffee. Later they went out on the back steps and were putting on their shoes when, Chisum said, he got hit and heard a shot. Chisum said he looked at Rackley and realized that something was wrong. He picked up "the gun" and carried it out to Rackley's pickup truck. He also said Rackley had in his belt in the house a gun that belonged to Chisum's father. He also said they were scuffling, and Rackley shot himself.

In addition to the three officers, one of the women testified at the Denno hearing that Chisum seemed calm: "I do not feel like he was drunk." An attorney who had been called by Chisum's father talked to Chisum a little later at the courthouse. As a defense witness he testified: "I never could get him to tell me what occurred. He didn't — he said, 'I don't know.' He would shake his head. 'I just don't know. I don't remember.' " The attorney said that Chisum was incoherent and "evidently had no memory at all of the events of the night before or that morning either." Chisum himself testified at the Denno hearing that he was drunk when he talked to the officers and did not remember what he told them. He did not testify before the jury.

Chisum first argues that we should set aside the trial judge's finding that Chisum's statement, which did not amount to a confession, was voluntary. Although we make an independent determination of the voluntariness of such a statement, we do not set aside the trial judge's finding unless it is clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515 (1974). In our independent review we recognize the trial judge's superior

position in determining matters of credibility. *Whitmore* v. *State*, 263 Ark. 419, 426, 565 S.W. 2d 133 (1978).

Here the trial judge's decision was not clearly erroneous. Chisum's statement itself shows that he remembered many of the pertinent events. His recollection is corroborated by other witnesses with respect to what happened after he reached his sister's house. The three officers thought he was able to make a statement. The State's fourth witness, who was the only Denno witness to see Chisum both before and after the crime, did not think he was drunk. Chisum's statements to the attorney could well have been motivated by self-interest, as he seems to have remembered things quite well up until the fatal shot and then suffered a complete cessation of memory. On this point reversible error is not shown.

Second, it is argued that there were deficiencies in the prosecution's chain of custody of certain exhibits: A knife that Rackley had, the pistol used in the shooting, four live and three spent pistol cartridges, and a mutilated slug taken from Rackley's body at the autopsy. Two possible witnesses, Peyton and Carlton, did not testify, but the trial judge concluded before admitting the exhibits into evidence that even if the chain was not completely unbroken the proof was sufficient to identify the articles.

We find no abuse of discretion. *Wickliffe & Scott* v. *State*, 258 Ark. 544, 527 S.W. 2d 640 (1975). The jury was free to consider any omissions in weighing the testimony as a whole. The important point is that, although the State's case was circumstantial, the omissions did not affect vital matters. The State showed that two men who had been arguing heatedly went into the garage together, alone, and within a few minutes one of them was shot and killed. Chisum put the gun in a truck, where the officers recovered it. Trace metal tests indicated that Chisum had carried the gun against his stomach under his belt and had held it in his hand. A similar test at the autopsy indicated that Rackley had not held the gun or carried it in his belt. The slug taken from the body was so damaged that it could not be traced to a particular pistol. Thus the identity of the pistol, of the

cartridges, or of the slug was not an essential element in the State's case, as a fingerprint or blood sample might be in some other situation. The trial judge's preliminary ruling, admitting the exhibits, was right.

Third, it is argued that the sheriff and his secretary should not have been permitted to narrate statements made by Mrs. Garrison to the sheriff during his investigation of the case. The statements had not been signed by her, but the principal one had been read back to her and acknowledged to be correct. Those matters, however, went only to the weight of the evidence, because the statements were unquestionably admissible for the purpose of impeachment whether she had acknowledged their accuracy or not.

We observe at the outset that the prosecution was mistaken in offering the statements as recorded recollections under Uniform Evidence Rule 803 (5), Ark. Stat. Ann. § 28-1001 (Repl. 1979). That section of Rule 803 merely recognizes the common law rule permitting a witness to use a contemporaneously made memorandum when, as we have quoted, "the witness is totally lacking in present recollection and cannot revive it by stimulation, but there was a time when he did have a sufficient recollection and when it was recorded." *St. Louis S.W. Ry.* v. *White Sewing Machine Co.*, 78 Ark. 1, 93 S.W. 58, 8 Ann. Cas. 208 (1906). Instances of the proper application of Rule 803 (5) would include the testimony of a witness who bought an appliance and wrote down its serial number or who had a traffic collision and wrote down the other motorist's license number. Mrs. Garrison's detailed accounts to the sheriff were not within the rule.

Even so, we will not reverse a trial judge's ruling, even though he gave the wrong reason, if the ruling was right. *Moose* v. *Gregory*, 267 Ark. 86, 590 S.W. 2d 662 (1979); *Reeves* v. *Ark. La. Gas Co.*, 239 Ark. 646, 391 S.W. 2d 13 (1965). That is the situation here, because the statements were admissible for impeachment, as inconsistent out-of-court statements made by Mrs. Garrison. Such statements have long been admissible at common law and are admissible under Uniform Evidence Rule 613, provided the

witness is first given an opportunity to explain or deny the statements. *Reynolds* v. *State*, 254 Ark. 1007, 497 S.W. 2d 275 (1973); *Thomas* v. *State*, 72 Ark. 582, 82 S.W. 2d 202 (1904). In *Thomas* we also recognized the rule, preserved in Uniform Evidence Rule 607, that the State may impeach its own witness.

It was formerly our rule that inconsistent statements were admissible only for impeachment and not as substantive evidence. *Comer* v. *State*, 222 Ark. 156, 257 S.W. 2d 564 (1953). That limitation has now been abolished entirely in civil cases and has been similarly abolished in criminal cases when the prior statement was given under oath and subject to the penalty of perjury. Uniform Evidence Rule 801 (d) (1). The common law rule was not otherwise changed by the Uniform Rules and still prevails in criminal cases when the prior statement was not under oath. Field, A Code of Evidence for Arkansas?, 29 Ark. L. Rev. 1 (1975); *United States* v. *Ragghianti*, 560 F. 2d 1376 (9th Cir. 1977), construing Federal Evidence Rule 801 (d) (1), after which the state Uniform Rule was patterned.

Here the prior statements were clearly admissible, even though Mrs. Garrison professed to have forgotten what she had told the sheriff. In effect she testified to nothing that was unfavorable to her brother. She did say that when Chisum first came back in the house he said: "I need help. Roger has been shot." She could not, however, remember any of her statements to the sheriff that implicated Chisum in the shooting, even though the prosecutor went beyond the minimum requirement and allowed her to read the prior statements before asking her about them. She could not remember having asked Johnnie, "Why? Why?", nor his reply, "Well, it was either him or me." She could not remember his having a pistol in his hand after the shooting and saying, "This is what did it." She testified, to the contrary, that she did not know what he had in his hand. She also said that she did not remember Johnnie's having said anything to her when he came back in.

Thus her testimony, unimpeached, would have suggested to the jury that when her brother came back in the

house he did not have the pistol, he made no explanation of the shooting, inculpatory or otherwise, and in fact he said practically nothing at all. That she professed not to remember what she had said to the sheriff did not preclude the prosecution from using her prior inconsistent statements. In an almost identical case, where a witness sought to shield his brother by saying that he did not remember his own prior statement, we held the statement to be admissible. *Billings* v. *State*, 52 Ark. 303, 12 S.W. 574 (1889). Our statute was then similar to Uniform Rule 613, requiring that the witness first be questioned about the alleged inconsistent statement. We held that the statement was admissible despite the witness's asserted lack of memory. Justice Hemingway's reasoning is so compelling and so peculiarly applicable to the present case that we quote his words:

> The statute does not place the right to impeach a witness by proof of contradictory statements, upon the condition of his denial. It requires his cross-examination upon the matter; nothing more. This is exacted in order that he may explain apparent contradictions and reconcile seeming conflicts and inconsistencies. If he cannot remember the fact, he is unable to do what the law affords him the opportunity to do. If he cannot remember the statement made, it is quite as probable that his recollection of the occurrence about which he testifies is inaccurate or incorrect. If contradiction properly affects the value of his testimony when he denies, it is difficult to see why it should not when he ignores the contradictory or inconsistent statements. The testimony is discredited because he affirms today what he denied yesterday; the legitimate effect of such contradiction cannot depend upon his power to remember it. If the defect in the memory is real, the proof of the contradiction apprises the jury of this infirmity of the witness; if he has made a false statement under the pretense of not remembering, he should not escape contradiction and exposure. We think the evidence was properly admitted.

We again applied the rule in *Humpolak* v. *State*, 175 Ark. 786, 300 S.W. 2d 426 (1927).

In the court below defense counsel's only objection to the proffered statements was that they were hearsay. True, but they were nevertheless admissible for impeachment. When evidence is admissible for one purpose but not for another, an objection is wholly unavailing unless the objecting party asks the court to limit the evidence to its admissible purpose. *City of Springdale* v. *Weathers*, 241 Ark. 772, 410 S.W. 2d 754 (1967); *Shipp* v. *State*, 241 Ark. 120, 406 S.W. 2d 361 (1966); *see* Uniform Evidence Rule 105. AMCI 202 is a limiting instruction covering this precise situation; doubtless the trial court would have given it if requested to do so. There was no such request. We find no basis for reversal on this point.

The two remaining arguments may be considered together. An autopsy was performed, but Dr. Carlton, the physician in charge, did not testify. He was assisted by the witness Moreland, who described how they opened the body and observed the track of the bullet, which entered both the heart and the liver. Moreland's testimony is objected to on the ground that he was not qualified as an expert. He testified, however, that he had assisted at 500 post mortems and had performed 300 trace metal tests. The trial judge has discretion in determining the competency of an expert witness. *Smith* v. *State*, 243 Ark. 12, 418 S.W. 2d 627 (1967). Similarly, whether the qualifications of an expert witness with respect to knowledge and special experience have been established rests largely within the trial judge's discretion. *Firemen's Ins. Co.* v. *Little*, 189 Ark. 640, 74 S.W. 2d 777 (1934). Here Moreland's extensive practical experience in observing and assisting with autopsies qualified him to describe what he saw.

As to the cause of death, it was not necessary for the State to call an expert to testify that the gunshot killed Rackley. Jurors are not required to lay aside their common knowledge and experience. AMCI 103. Proof that Rackley died minutes after he was shot by a bullet that entered his heart was amply sufficient to prove the cause of his death.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. The first prejudicial error made in this case was the admission into evidence of the statement of the appellant. It is elementary that the burden is upon the state to demonstrate that a statement made while in custody was freely and voluntarily given. *Clark* v. *State*, 264 Ark. 630, 573 S.W. 2d 622 (1978). The statement was made a short time after the appellant was taken into custody. His Miranda rights were allegedly read to him while he was still at the scene of the shooting. The officer who gave him his Miranda warnings subsequently stated:

> He appeared to know what his faculties was. Quite obviously he was drinking. I could smell alcohol on his breath. I think the defendant understood his rights and every question I asked him.

The county sheriff stated that appellant appeared to be very nervous, that he could tell from his observations of the appellant that he had been drinking but nevertheless, in his opinion, appellant could understand the rights that Lieutenant Duvall gave him. The third officer involved stated that he knew Chisum had been drinking from the odor of alcohol and from his nervousness. He further stated that he thought Chisum was under the influence of alcohol so much that he should not have been allowed to drive an automobile. He stated further that he was not staggering and his speech was not slurred.

During the time in which these three officers talked with the appellant there was no one else around. At first it was the appellant and Duvall and later they were joined by the other officers. All three officers, who obviously have an interest in the outcome of the case, indicated the appellant had been drinking. In fact, the breathalyzer indicated that he tested .14 at 10:30 or 11:00 a.m. following his having been taken into custody at 8:00 or 8:30 that morning. I think we can assume he had not had anything additional to drink during the time he was in the custody of the officers. While he was being held in custody, an attorney appeared at the

request of the appellant's father. When the attorney appeared, the officers were running a trace metal test on the appellant and the attorney asked the appellant not to say anything and he asked them not to ask any more questions. The attorney stated he did not know that the appellant had given a statement to the officers, and they did not tell him that they had taken one. In his opinion, the appellant could not give a voluntary and intelligent statement because he was drunk. According to the lawyer, the appellant had a very definite odor of alcohol about his person, his speech was slurred, and he could not get him to tell what had happened. The lawyer further testified that the appellant was incoherent and evidently had no memory at all of any events which had happened the evening before and on the date in question up until the time the lawyer observed the appellant. The appellant was later questioned about the incident and he could not remember talking to Lieutenant Duvall. He could only remember talking to one officer but he did not know who it was. It seems to me that the preponderance of the evidence clearly shows the statement was not voluntarily and intelligently given and should have been excluded. It was a useless thing for the state to insist on presenting such statement when the evidence was otherwise more than adequate to obtain the conviction.

The second error I find in this case was the admission into the record of statements given by witness Alta Garrison. The statements had allegedly been made in the presence of the sheriff and his secretary at the time of the initial investigation. The statements had not been signed by the witness. In fact, when she was asked about the statements, she stated she did not remember them. I agree with the majority that the statements were not admissible under Uniform Evidence Rule 803 (5), Ark. Stat. Ann. § 28-1001 (Repl. 1979). It is wrong to affirm the trial court when it committed error by allowing evidence to be admitted for an improper purpose. Although the same evidence may have been properly admitted under different circumstances, in this case the other circumstances never arose. There certainly is no precedent for the trial court or this court to complete the state's cases for it when it fails to do so. I do not want to be a part of starting such a practice.