Charles DURHAM *v.* STATE of Arkansas

5601                                          471 S.W. 2d 527

Opinion delivered October 18, 1971

*Ponder, Lingo & Hilburn,* for appellant.

*Ray Thornton,* Attorney General; *Milton R. Lueken,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant Charles Durham was convicted of the burglaries on May 23, 1970, of the dwelling houses of E. C. Hardin and Neal James located in the same farming community in Sharp County. The separate burglary charges were consolidated for trial by agreement. Property taken from the Hardin home included a .22-caliber and a .30-.30 Winchester rifle. A .30'06 rifle was among the articles taken from the James residence. Before trial, appellant moved to quash warrants for the search of the truck, residence, barn and premises of appellant in Lawrence County issued by Lucian J. Lee, a justice of the peace of that county. Appellant's motion asked that the evidence obtained on the basis of the warrants be suppressed. This motion was denied, and the tangible evidence found by the officers was admitted during the trial.

Appellant asks us to reverse his conviction because there was no adequate foundation for the issuance of the warrants. Specifically, appellant argues that probable cause for the issuance of the warrants was not shown by affidavit or evidence under oath. We agree with this contention and with appellant's further argument that the evidence to which he objected was inadmissible as "fruit of the poisonous tree."

One of the affidavits was made by Sheriff Ray Martin of Sharp County. In it, the sheriff merely stated that he had good reason to believe that, on May 23, 1970, Charles Durham broke into, entered and carried away from the home of Neal James a Zebco reel, a 12-gauge shotgun, a .22 automatic rifle and a .30'06 rifle. In the other, E. C. Hardin swore that Durham committed burglary by breaking and entering affiant's residence and removing a .22-caliber Stevens automatic rifle, a .30-.30 caliber lever action Winchester saddle gun, and a .303-caliber British rifle.

Testimony on the motion to suppress showed substantially the following:

E. C. Hardin saw Durham pass the Hardin residence on Saturday, May 23, and subsequently saw Durham in the vicinity several times. Hardin took the license number of the pickup truck in which Durham was traveling. He could see no gun in Durham's truck on that day. On Sunday morning after the burglaries, Sheriff Martin ascertained that the license number was issued in Lawrence County. He and his deputy, Frolis, picked Hardin up and drove to that county. Hardin saw the truck at Durham's mother's house in Lynn. When the officers approached the truck, two men got out of it. As they were talking to the officers, Hardin moved closer to the truck and saw his .22-caliber rifle in open sight in a rack in the truck. He pointed out the rifle to Deputy Sheriff Frolis and identified it. Possession of the rifle was then taken by Frolis. Hardin stated that he read, signed and swore to the affidavit for a search warrant after Lee wrote it out. He testified that he had told Justice Lee the same things that he had testified at the hearing.

Sheriff Martin testified that he had written out the other affidavit and that Lee had sworn him to it. He also said that he and Hardin told Lee the same things they had stated in their testimony at the hearing.

After the affidavits were made, Lee issued the search warrants. Martin, Frolis and Hardin proceeded to the Durham residence, where Sheriff Guthrie of Lawrence County was awaiting their arrival. One of Sheriff Guthrie's deputies read the warrants to Durham. The weapons were not found in the house, and the testimony as to whether the house was actually entered is somewhat conflicting and confusing. At any rate, while the officers were in the yard surrounding the Durham residence, one or more of them detected a fresh trail leading from the back corner of the yard into a field in which fescue was

growing knee-deep. Upon following this path for about 200 yards, the officers found nine guns, two of which were described in the search warrants and were later identified as having come from the two residences which had been burglarized. The yard had been mowed and was fenced. The field constituted a part of the Durham place on which the house was located and of which the yard was also a part.

It is elementary that a valid search warrant cannot be issued except upon probable cause determined from facts and circumstances revealed to the issuing magistrate under oath or affirmation. *Walton* v. *State,* 245 Ark. 84, 431 S. W. 2d 462. The determination may not be based upon conclusions of those seeking the warrant. *Walton* v. *State,* supra; *Bailey* v. *State,* 246 Ark. 362, 438 S. W. 2d 321. While the facts supplied in a written affidavit may be supplemented by oral testimony, these additional facts must be disclosed from testimony given under oath.[1] *Walton* v. *State,* supra.

It is clear that the affidavits in this case stated mere conclusions of the respective affiants, so the warrants were not valid, unless the magistrate could have found reasons for those conclusions from testimony of Martin and Hardin given under oath. We have no doubt that statements made by these witnesses to Lee would have furnished sufficient basis for the finding of probable cause for issuance of a valid search warrant. The determination of this critical question turns upon the testimony of Lee. The pertinent part of his testimony follows:

Q. How did you come to issue those Search Warrants—what caused you to issue them, in other words?

A. By the complaint of Mr. Hardin and the Sheriff of Sharp County making requests for the issuance of the Warrants under the Affidavits.

Q. Was there anyone besides those two men?

---

[1]This probably is not permissible under Act 123 of 1971, which became effective after the issuance of these warrants.

A. No, sir.

Q. And we are talking about Mr. Hardin and Sheriff Martin?

A. Yes, sir.

Q. Did they come to your home?

A. They did.

Q. Did Sheriff Martin make a request of you for a Search Warrant?

A. He did.

Q. Did Mr. Hardin make a request of you for a Search Warrant?

A. He did.

Q. Did each one of them then sign an Affidavit for a Search Warrant?

A. They did.

Q. Did you swear them at the time they signed to the Affidavits that they signed?

A. I did. In addition I swore them to testify to that as well as signing the Affidavits for the Warrants, which states, "I do solemnly swear that the allegations set forth are true to the best of my knowledge and belief." You know what the form is on the affidavit for procuring a Warrant?

Q. Yes, sir.

A. But in addition to that, I administered an oath to them to testify to the fact or the reasons that they wanted the Search Warrant. They swore the facts contained in there were so.

Q. You mean that the facts contained in the Affidavits were true?

A. Yes, sir. In other words, there was a double oath. The one that they signed on the form and then the one that I administered to them.

Q. Le me see if I am completely clear on this, Mr. Lee. You have the Affidavits with you, don't you?

A. I do.

Q. All right, if you will, get those out, Mr. Lee, so both of us can follow along on the same thing. On the affidavit that was made by Mr. Hardin—

A. All right.

Q. Are you talking about the line on the bottom where it says, "Sworn to and subscribed before me this 24th day," No, I think I see now what you are talking about at the top there where it says, "I, E. C. Hardin, do solemnly swear,"—

A. That's right.

Q. Is that writing there those words which say, "do solemnly swear," on the affidavit, was that one of the things you were referring to that was an oath?

A. Yes sir.

Q. Then you said there was something else—in addition to the wording on the paper that they signed, do I understand that either before they signed or after they signed that you then had each one of them hold up his hand—

A. And swear—

Q. And swear that what was on the paper, that is, what was written in this Affidavit—

A. Yes, sir, that the allegations set forth to their knowledge and belief was true.

Q. As set forth in the Affidavit?

A. That's right.

Q. And is that true of both Mr. Hardin and Mr. Martin?

A. It is.

Q. Were they put under oath by you or sworn by you at any other time while they were at your house in connection with these search warrants?

A. No, sir, that was the only time.

We do not think that this evidence justifies any inference that the oral statements made by the complainants were under oath. We take this testimony to mean that Martin and Hardin swore that what was written in the respective affidavits was true but that they were not put under oath or sworn by the magistrate at any other time. The reference to double oaths was explained by Lee to refer to the written oath and the oral oath, but both related only to the allegations of the respective affidavits. Because we take the evidence to show that the complainants were not under oath when they gave the supplemental testimony, the warrants were not valid.

If the rifles had been found in the Durham field without a warrant and without an entry of the yard around the Durham house by the officers, there is little room for doubt that their seizure would have been justified as the fruit of a valid "open-field" search. See *Jones* v. *State*, 246 Ark. 1057, 441 S. W. 2d 458. The evidence before us, however, clearly shows that the trail or path from the yard was discovered by the officers

only after their entry under the invalid search warrant. There is no evidence that the trail could have been seen from any place other than the yard. Unlike the field where the rifles were found, this yard was the curtilage of the Durham dwelling and, as such, subject to the same constitutional protection as the house itself. *McDowell* v. *United States,* 383 F. 2d 599 (8th Cir. 1967); *Wattenburg* v. *United States,* 388 F. 2d 853 (9th Cir. 1968).

The exclusionary rule which has long operated to bar tangible materials obtained as the direct result of an unlawful invasion has been extended to apply to those found as an indirect result. *Wong Sun* v. *United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *Walton* v. *State,* 245 Ark. 84, 431 S. W. 2d 462.

If the evidence to which objection is made has been obtained by exploitation of a primary illegal police action rather than by means sufficiently distinguishable to be purged of the primary taint, it is to be excluded as "fruit of the poisonous tree." *Wong Sun* v. *United States,* supra; *Walton* v. *State,* supra. It is true that the burden was upon Durham to convince the court that the evidence was inadmissible under this doctrine. *Walton* v. *State,* supra. But the evidence can only be taken to show that the discovery of the rifles in the "open field" was an exploitation of the invalid search warrant. There is no evidence which would justify an inference that the rifles were or could have been discovered without entry upon Durham's curtilage. In various applications of the "poisonous tree" doctrine, it has been held that seizure of objects in "plain view" cannot be justified if the seizing officers had to physically invade a constitutionally protected area in order to secure the view. *United States* v. *Davis,* 423 F. 2d 974 (5th Cir. 1970); *McGinnis* v. *United States,* 227 F. 2d 598 (1st Cir. 1955); *Commonwealth* v. *Watkins,* 217 Pa. Super. 332, 272 A. 2d 212 (1970); *State* v. *Hagen,* 258 Iowa 196, 137 N. W. 2d 895 (1965). We can see no difference in application of the doctrine in "plain view" cases and in those such as this, where the information utilized by the officers to discover tangible evidence was the direct result of an unauthorized entry upon the curtilage of a suspect.

In the light of our conclusion, the convictions must be reversed. For this reason, we do not consider appellant's other point for reversal—that a new trial should have been granted because one who had been appointed deputy sheriff served as a juror. It is highly improbable that this question would arise upon a new trial.

The judgments are reversed and the case remanded for new trial.

HARRIS, C. J., and JONES, J., dissent.

J. FRED JONES, Justice dissenting. I do not agree with the majority opinion in this case. There is no question that Sheriff Martin as well as Hardin related to Justice Lee all they knew about the case in explaining to him why they suspected the appellant as the burglar, and why they suspected that the appellant had the remainder of the stolen articles concealed on his premises. There is no question that they gave Justice Lee probable cause and reasonable grounds for issuing the search warrant. The majority opinion recognizes this, but seems to conclude that the witnesses were under oath to only so much of the information Justice Lee wrote into the paper affidavit forms. The majority opinion seems to turn on whether Justice Lee first took the information under oath and then wrote all, or a part of it, into the affidavit forms which were subscribed and sworn to, or whether he first wrote out the information on the affidavit forms which were then subscribed and sworn to. The search warrant itself was regular and valid on its face. Its validity was approved by the magistrate who issued it, and its validity was approved by the circuit judge who saw and heard the witnesses as they testified at the hearing on the motion to suppress.

Justice Lee did not have printed affidavit forms for search warrants but he did have printed affidavit forms for arrest warrants. So he attempted to use a hand-written form prepared by the sheriff and also printed affidavit for arrest forms which he attempted to convert into affidavit for search warrant forms. At the hearing on the motion to suppress Sheriff Martin testified:

"This is handwritten because the Justice of the Peace did not have a form affidavit for a search warrant. The affidavit originally was for a warrant of arrest and he added 'and search' and, of course, the handwritten affidavit is the one that I made. It is in my writing and is signed by me and sworn to before the Justice of the Peace.

Q.  It was sworn to by you?

A.  Yes, sir.

\*    \*    \*

Q.  I believe I understood you to say that the Justice swore you to your affidavit?

A.  Yes, sir.

Q.  Was it on the basis of your handwritten affidavit here that the Search Warrant was issued that we are now using in Case No. 52?

A.  We told him the same story that we have told you. In other words, we told him why we were there."

Mr. Hardin testified to the above facts as to reporting the license number to the sheriff and subsequently identifying his stolen .22 rifle in the back of the appellant's pickup truck, after which he went with Sheriff Martin to Justice Lee's home to obtain the search warrant for the search of appellant's premises. In this connection Mr. Hardin testified, in part, as follows:

"Q.  Then did you .go over to Justice Lucien Lee's house?

A.  Yes, sir, and signed this right here.

Q.  You are pointing there to an affidavit that you made?

A. Yes, sir.

Q. Who wrote that out, Mr. Hardin?

A. Lucien Lee, I suppose.

Q. Well, you should—

A. Well, I seen him writing and I read it.

Q. Sir? You were there?

A. Yes, sir, Lucien Lee.

Q. Lucien Lee wrote it out?

A. Yes, sir.

Q. Then, what did he do with it?

A. Had me to sign it and Sheriff Martin took it.

Q. Did Squire Lee swear you to that affidavit?

A. Yes, sir.

Q. Had you hold up your hand?

A. Yes, sir.

Q. And then that affidavit there would be what he issued this Search Warrant on I suppose?

A. Yes, sir.

Q. Would that be right?

A. *I suppose that's right,* yes, sir."

(Emphasis added).

Now the affidavit form prepared in longhand recites that Ray Martin, sheriff of Sharp County, states on

oath that he has good reason to believe that on May 23, 1970, Charles Durham broke and entered and carried away property from the home of Neal Hames (another prosecuting witness whose house had been burglarized on the same afternoon). A blank affidavit for warrant of arrest (and search) was also signed by Sheriff Martin and sworn to before Justice Lee. The affidavit form signed and sworn to by E. C. Hardin is on an affidavit for warrant of arrest form with the words "and search" added. This form is filled out to the effect that on the 23rd day of May, 1970, Charles Durham committed the crime of burglary by breaking and entering Hardin's residence and unlawfully removing therefrom a .22 caliber automatic rifle, a 30-30 caliber lever action Winchester Saddle gun and some other specifically described property. The printed affidavit form (originally an affidavit for arrest form), in the printed portion, prays a warrant from Lucien J. Lee, Justice of the Peace, to apprehend said Charles Durham (the appellant) to be dealt with according to law. This form was subscribed and sworn by Mr. Hardin before Justice Lee.

The majority view seems to be that Justice Lee either put everything into the affidavit forms that was testified to under oath by Sheriff Martin and Mr. Hardin, or that he was required to do so before he could issue a valid search warrant. I do not have such view. It is my view that Justice Lee was not required to try the defendant in *Absentia* with a complete record of the evidence transcribed in the affidavit form, neither was it necessary for Justice Lee to be convinced beyond a reasonable doubt. It is my view that an affidavit for a search warrant is primarily for the information and benefit of the magistrate who has been requested to issue such warrant, and it is my view that a form affidavit is not necessary for the procurement of a valid search warrant in every case. It is not required by the constitution and was not required by statute when the warrant in this case was issued.

Amendment 4 of the United States Constitution and Art. 2, § 15 of the State Constitution having to do with unreasonable searches, for all practical purposes are

identical. The language of the state provision is as follows:

> "The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

Ark. Stat. Ann. § 43-201 (Repl. 1964), under which the warrant in this case was issued, provides as follows:

> "Upon complaint being made on oath, before any officer authorized to issue process for the apprehension of offenders, that any personal property has been stolen or embezzled, and that the complainant suspects that such property is concealed in any particular house or place, if such officer shall be satisfied that there is reasonable ground for such suspicion, he shall issue a warrant to search for such property."

Thus it is my opinion that all the constitution requires is "probable cause supported by oath or affirmation," and all that the statute requires is a "complaint . . . made on oath." Justice Lee made out the search warrant on the basis of the complaint made to him by Sheriff Martin and Mr. Hardin, they were his only source of information. There is nothing in the record indicating that Justice Lee had any personal interest in the case or knew anything about the facts other than those furnished by the complainants. The majority seem to concede that Justice Lee had reasonable grounds for suspicion, as set out in the warrant, but conclude that grounds stated were not stated under oath. Justice Lee states otherwise in the face of the warrant. The search warrant issued by Justice Lee recites as follows:

> "Whereas, *Complaint has been made, on oath,* before the undersigned, one of the Justices of the Peace in and for the County of Lawrence by E. C.

Hardin that certain property of his, to-wit: One 22 Cal. Automatic Steven Rifle, one 30-30 Cal. Lever Action Winchester Sadle Gun, and one 303 Cal. British Rifle, with Bayonet block removed, and stock forearm shortened, and hole where sling strap was inserted, filled with plastic wood, has been stolen, or embezzled, and that the said complainant suspects that such property is concealed in the House, Car, Truck, barn or upon the premises or other property occupied by Said Charles Durham in said County; and Whereas, Being satisifed that there is reasonable ground for such suspicion YOU ARE THEREFORE HEREBY COMMANDED, To search the said place above mentiond, where such property is suspected to be concealed, in the any hour of day or night, including Sunday, and to bring such property or any part thereof, which may be found, before me, the said Justice, forthwith. Hereof fail not, and make return of this writ." (Emphasis added).

This is not a case where the complainant seeking a search warrant did so on "information and belief" obtained from an undisclosed confidential source as was the situation in *Walton* v. *State,* 245 Ark. 84, 431 S. W. 2d 462. The information presented to the Justice of the Peace in the case at bar was based on the eye witness account of Mr. Hardin, who had seen the appellant's truck leave his home in Sharp County; and immediately thereafter he found that his home had been burglarized and his rifles stolen. The very next day he saw with his own eyes the appellant in possession of one of his stolen rifles near appellant's home in Lawrence County and he so advised Justice Lee when he requested the search warrant.

With the above background, I now come to the crux of my disagreement, which lies in the interpretation of Justice of the Peace Lee's testimony. Justice Lee apparently felt that some paper affidavit form bearing a jurat was necessary and it is clear to me that he recognized that the forms he had were inadequate for the purpose. As I interpret his testimony, he not only attempted to

prepare paper affidavit forms and have the complaining witnesses sign them under oath, but that the oath, or oaths, he administered also covered the information furnished him as a basis for the search warrant he issued, and was not restricted only to that portion of the information or testimony he wrote into the affidavit forms. That part of Justice Lee's testimony from which I reach my conclusion, is italicized in his testimony, as follows:

"Q. Did you swear them at the time they signed to the affidavits that they signed?

A. I did. *In addition I swore them to testify to* that *as well as signing the affidavits for the Warrants,* which states, 'I do solemnly swear that the allegations set forth are true to the best of my knowledge and belief.' * * * *But in addition to that, I administered an oath to them to testify to the fact or the reasons that they wanted the Search Warrant.* * * * In other words, there was a double oath. The one that they signed on the form and then the one that I administered to them.

\* \* \*

Q. . . . Judge Lee, let me put the question this way and maybe I can keep from going back over all that has been testified to and tie it right down. Was the reason that these gentlemen gave you for wanting the Search Warrant for the Durham house, was that reason based on what they told you had happened a day or two before that that led them to suspect that Durham might be guilty of stealing some guns and had directed their attention toward him as being the possible guilty party—was that the kind of reason that they gave you for the search warrant?

A. *That's right, and also finding an automatic*

*rifle that was owned by Mr. Hardin in Mr. Durham's truck as it passed through Linn.*

Q. But still if I understand you, that was the kind of reason that they gave for the search warrant?

A. Yes, sir.

Q. And there was nothing—there was no particular reason they thought that Durham's house or barn or premises might have some stolen property on it except simply that they suspected Durham, would that be about the—

A. That would be about the substance of it *other than there were other guns aside from this automatic .22 rifle that they found in his truck. You know, he recognized it so he testified before me and told me in procuring the warrant, Mr. Hardin did, that he recognized the .22 automatic rifle in Durham's truck and then there were some others stolen from him that was embodied in the search warrant and they wanted a search warrant to obtain those guns or the property, if possible.*

Q. Are the other guns that you are talking about there the ones that were described in the search warrant?

A. Yes.

Q. Did either of the men give you any reason why they thought the stolen property would be found on the Durham farm other than adjoining farms except for the fact that they suspected Durham pretty strongly and this was his farm and premises?

A. That's right and finding the gun in his possession.

Q. The finding of the gun was what directed their suspicion toward Durham?

A. That's right." (Emphasis added).

It appears to me that the majority opinion in this case continues to muddy the already clouded 4th Amendment waters. (See concurring and dissenting opinions in *Coolidge* v. *New Hampshire* on certiorari to Supreme Court of New Hampshire, June 21, 1971). Law enforcement officers, including Justices of the Peace and magistrates, should not be required to search the unfamiliar and unclear depths of Supreme Court decisions for precise, and court approved language, to be incorporated into affidavits for search warrants before a valid search warrant can be issued.

The great differences in judicial opinion on questions of constitutional interpretation seem to arise from the so-called "strict" as opposed to "liberal" interpretation of its provisions. I recognize a possibility that under strict construction the constitution could be interpreted into a hard and rigid shell with the benefits of its provisions alienated and cut off from the people it was intended to protect and from the purposes it was intended to serve. I also recognize a possibility that through liberal construction the constitution could be interpreted into an instrument having the qualities of a mirror which would only reflect the changing views and philosophies of those charged with the responsibilities of looking into its provisions. Consequently, I accept strict construction as carrying the lesser evil of the two possibilities.

It is my opinion that when a man's house has been burglarized and his goods hauled away in a particular truck, and when the driver of that truck later flaunts a part of the stolen goods before the eyes of the victim of the burglary, the victim is justified in suspecting the truck driver as the felon, and is also justified in suspecting that he has the remainder of the stolen goods secreted on his premises. It is further my opinion that when such facts are made known by a complaint under

oath, before a magistrate, the magistrate has probable cause to issue a search warrant for the search of such premises.

When armed with a search warrant regular and valid on its face, it is my view that police officers should not be made unlawful trespassers in a search for stolen property by ambiguous testimony as to what specific portions of the information furnished the issuing magistrate were under oath and what portions were not. It is my opinion that the constitution contemplates no such procedure nor does the statute require it. Probable cause supported by oath or affirmation, and a complaint being made on oath, is all that should be required. It appears to me that the rule of evidence so recently recognized as "the fruit of a poisonous tree" has found fertile ground in the 4th Amendment and if permitted to grow and multiply unchecked, could easily obliterate the 4th Amendment or stunt and warp its purpose beyond recognition. I am of the firm opinion that both the constitutional and statutory requirements were fully met and complied with in this case; and that the .22 rifle, as well as the other objects of the search, was admissible in evidence against the appellant.

I would affirm.

HARRIS, C. J., joins in this dissent.