John Clifton GAYLORD *v.* STATE of Arkansas

CA CR 80-69                                    613 S.W. 2d 409

Court of Appeals of Arkansas
Opinion delivered March 25, 1981
[Rehearing denied April 22, 1981.]

*Larry R. Froelich*, for appellant.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

Tom Glaze, Judge. This appeal is a result of the appellant's, John Clifton Gaylord, conviction on the charges of the manufacture of a controlled substance (marijuana) and its possession with intent to deliver. He was sentenced to five years imprisonment and a $2,000 fine. Gaylord raises one primary issue: The trial court erred in refusing to suppress the marijuana evidence since it was seized by law enforcement officers in an illegal warrantless search.

For the most part, the facts are not in dispute. Gaylord, before and at the time of his arrest, was a resident of Stone County and was being visited by his step-brother, Harold Hall, and a friend, Raymond Hine. Hall and Hine were from Florida. The three men were occupying two premises on some acreage outside Mountain View, Arkansas, near the community of Pleasant Grove. The course of events which led officers to the discovery of the marijuana grown and located on one of the two described premises actually commenced in Mountain View.

Just after midnight on August 28, 1979, two officers, Larry Clark and Jackie Heck, responded to a telephone call from a person requesting that they investigate a van with a Florida license tag which was parked blocking a private driveway. During the time Clark and Heck checked out the van, Hall had returned to the vehicle. The officers discovered some marijuana in the van and on Hall and subsequently arrested and charged him with possession of a controlled

substance. By this time, three additional law enforcement officers, McCasland, Alexander and Avey, had joined Clark and Heck in the investigation and arrest of Hall, and Clark had nothing else to do with the subsequent events.

The officers were dissatisfied with the information that Hall gave them, so they began to conduct an investigation in the early morning hours on August 28 to determine where Hall lived, and the source of the marijuana they had found. Two of the officers, McCasland and Alexander, eventually encountered Gaylord and Hine, who were driving a vehicle. The officers stopped them and when Gaylord was unable to produce a driver's license or a proper motor vehicle registration, the officers arrested Gaylord and Hine and took them to jail. By the time they arrived at the jail, both Gaylord and Hine had identified themselves, stated who Hall was and explained where they lived. It was now about 6:30 or 7:00 A.M. on August 28, and all four officers, McCasland, Alexander, Heck and Avey, decided to find the house where the three men lived to determine if someone else was there, and as one officer said, ". . . to see what he (Hall) was hiding."

In driving to the men's residence, the officers proceeded along a private road and were required to go around a gate with a "No Trespassing" sign which was apparently placed there by a neighbor who owned property over which the road traversed before reaching the dwelling where the men lived. They then continued on the road up a canyon for approximately two miles where the officers then came to a second gate with a "Beware of Dog" sign. The gate had no fence attached. It was locked, but the hinges were not in place so the officers merely picked the gate up and set it back to gain access to the other side. The officers were then able to drive to the house where the men lived by following a cut-off road. No one was occupying the house when the officers arrived and departed their vehicle. Officer McCasland testified that he looked inside a tent located behind the house and it contained marijuana. Officers Alexander and Avey had walked up a hill in the road near the house and saw the marijuana patch.

It was the evidence obtained by the officers from this

marijuana patch which was the basis for Gaylord's conviction. All other evidence which was seized and garnered by the officers, including contraband found in the tent and house, was duly suppressed by the judge at the trial of this cause. The trial judge denied Gaylord's motion to suppress the marijuana evidence from the marijuana patch found on his property, thereby rejecting Gaylord's contention this evidence was seized illegally without a search warrant. The State argued at trial, and now argues on appeal, that no search warrant was necessary because the marijuana patch discovered by the officers was in plain view and in an open field, an area not protected by the Fourth Amendment. The Supreme Court in *Hester* v. *United States*, 265 U.S. 57 (1924), held that the Fourth Amendment to the Constitution only protects against unreasonable searches and seizures of persons, houses, papers and effects and does not extend to open fields and forested areas. Consistent with *Hester*, our Arkansas appellate courts have found on many occasions an open field to exist and permitted searches without a warrant. *Gustafson* v. *State*, 267 Ark. 830, 593 S.W. 2d 187 (Ark. App. 1979); *Ford* v. *State*, 264 Ark. 141, 569 S.W. 2d 105 (1978); *Sanders* v. *State*, 264 Ark. 433, 572 S.W. 2d 397 (1978); and *Bedell* v. *State*, 257 Ark. 895, 521 S.W. 2d 200 (1975). It is also settled law that property seized that is located on one's person, at one's residence or within the "curtilage" surrounding the residence may not be seized without a search warrant, or pursuant to other legal means. *Durham* v. *State*, 251 Ark. 164, 471 S.W. 2d 527 (1971). The court in *Sanders* recognized the definition of curtilage of a dwelling-house to be a space necessary and convenient, habitually used for family purposes and for the carrying on of domestic employment.

From a review of the facts at bar, we have no doubt that the marijuana patch was located in an open field rather than being part of the curtilage of Gaylord's dwelling. The record reflects that the marijuana field was fifty to sixty yards behind the house, and there is no evidence that any family use or domestic employment was performed on or around this area except for the illegal cultivation of marijuana. On the other hand, there was evidence introduced, including photographs, which showed that the marijuana was grown in a wooded area. Our Supreme Court in *Bedell* and *Ford, supra,*

held similar wooded areas to be an open field and not subject to Fourth Amendment protection.

Gaylord next argues that the officers were required to go through the yard and curtilage of the dwelling-house to find the contraband and that the evidence discovered was the direct result of an unauthorized entry upon the curtilage. In this connection, Gaylord relies on *Durham* v. *State, supra*, wherein the investigating officers found some stolen rifles in an open field about two hundred yards from the defendant's residence. The officers had discovered a trail which led to the guns while they were in the defendant's yard. The evidence showed that the trail could not have been seen from any place other than the yard. Since the seizure of the guns originated from the constitutionally protected curtilage area, the *Durham* court held the evidence inadmissible since the officers obtained it without a search warrant.

The facts at bar are distinguishable from those in *Durham*. However, it is important to note that the curtilage/open fields distinction which was first noted in *Hester* v. *United States, supra*, appears to have been modified by the Supreme Court's decision in *Katz* v. *United States*, 389 U.S. 347 (1967).[1] In *Katz*, the court said:

> (T)he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. ... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

Since the *Katz* decision, the United States Supreme Court has consistently held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable" or a "legitimate expectation of privacy" that had been invaded by government action. See *Smith* v. *Maryland*, 442 U.S. 735, 740 (1979).

[1] W. Ringel, *Searches & Seizures, Arrests and Confessions*, § 8.4 (1980).

1 Wharton's *Criminal Procedure*, § 150 (12th Ed. C. Torcia 1974).

The Arkansas Supreme Court, however, has not expressly mentioned the privacy standard enunciated in *Katz* in any of the open field cases it has decided since 1967. This includes the *Durham* case upon which Gaylord relies. In our own court's decision in *Gustafson* v. *State, supra*, we did apply the privacy concept to an open field case but did not mention *Katz* in doing so. In *Gustafson*, the officers went to the defendant's apartment merely to ask questions concerning stolen CB equipment. After talking with the defendant and also viewing an antenna on top of defendant's apartment, the officers became suspicious. One of the officers later saw the defendant leave his apartment with an arm load of equipment and run into a wooded area behind his apartment. The officer, without a warrant, located the equipment, determined it was stolen and arrested the defendant. We held on appeal that the defendant had no reasonable expectation of privacy in the wooded area behind his apartment and it was not within the purview of one's "curtilage" as defined in *Sanders* v. *State, supra*.

In *Dean* v. *Superior Court for County of Nevada*, 35 Cal. App. 3d 112, 110 Cal. Rptr. 585 (1973), the court, in considering the *Hester* open field doctrine and the privacy standard in *Katz*, stated:

> A generalized expression of Fourth Amendment doctrine usually excludes 'open fields' from the scope of constitutional protection. ... Consistently with *Katz* v. *United States, supra*, the courts recognize that a test phrased in terms of 'constitutionally protected areas' often falls short; that a more fundamental test is whether the person has exhibited a reasonable expectation of privacy covering the area of the search or seizure. ... The immediate question, then, is whether the marijuana field lay within the owner's reasonable expectations of privacy. [Citations omitted.]

The basic test set out above in *Dean* is the same standard that we adopted in *Gustafson*. Applying this test to the facts at bar, we must decide whether the marijuana patch lay within Gaylord's reasonable expectations of privacy. In considering this question, Gaylord reminds us that the officers'

view of the marijuana patch was first obtained while on the curtilage of his dwelling, and as mentioned earlier, he argues all evidence obtained due to the invasion of the curtilage must be suppressed under the Arkansas Supreme Court's holding in *Durham* v. *State, supra*. We cannot agree.

First, it is not clear from the record whether the officers were standing on or near the curtilage when they saw the marijuana. Under the test required under *Gustafson* and *Dean*, we need only to determine if Gaylord exhibited a reasonable expectation of privacy covering the marijuana patch that was searched. If the officers observed the marijuana in open view, it is of no import if they were standing on the curtilage. In *United States* v. *Santana*, 427 U.S. 38 (1976), the court held that there was no reasonable expectation of privacy in the doorway of one's home, and consequently, the warrantless felony arrest of defendant in her doorway did not violate the Fourth Amendment. The court stated:

> While it may be true under the common law of property the threshhold of one's dwelling is 'private' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place. She was not in an area where she had any expectation of privacy.

Driveways and walkways used to approach a dwelling are portions of the curtilage as traditionally defined, but under *Katz*, the expectation of privacy in such areas is not generally considered reasonable. See *United States* v. *Magana*, 512 F. 2d 1169 (9th Cir.) *cert. denied* 423 U.S. 826 (1975); and *State* v. *Nine*, 315 So. 2d 667 (La. 1975).

In the instant case, the actions employed by the officers in initially arresting Gaylord and Hine were questionable. In following up their investigation of Hall, however, they certainly were permitted to go to the residence where Hall, Gaylord and Hine lived to ask questions of anyone they may find. Although the officers encountered a gate with no fence as they approached Gaylord's property, there were no "No Trespassing" signs and the gate could be and was easily

removed. Without question the house and tent which was on the curtilage were subject to a reasonable expectation of privacy, and since there was a warrantless intrusion into these areas before any warrant was obtained, the trial court correctly excluded the evidence and contraband obtained from these areas. The evidence is unrebutted, however, that the officers who saw the marijuana patch were merely standing in the road on a hill not far from Gaylord's dwelling. These officers did not find a trail, as in *Durham*, which led their search to the marijuana in the wooded area behind the dwelling. From the road the officers could see the area in question and Gaylord had in no way attempted to hide or obstruct the view from any person who may be present on this road near the dwelling. We hold that Gaylord exhibited no expectation of privacy which would cover the marijuana field he was cultivating and since the officers had a plain view of the contraband, there was no search in the constitutional sense. Therefore, we hold the trial court correctly denied Gaylord's motion to suppress the evidence obtained from the marijuana field.

A second issue for reversal was raised by Gaylord in connection with a search warrant which was obtained by the officers sometime after they had found the contraband on the Gaylord premises. Of course, our decision contemplates that no warrant was necessary for the marijuana found in the open field, and all the other evidence seized pursuant to the warrant was suppressed. Therefore, this issue involving the warrant is moot.

For the foregoing reasons, we affirm.

Affirmed.

CLONINGER, J., dissents.