Billy Frank GROSS *v.* STATE of Arkansas

CA CR 82-176                                     650 S.W.2d 603

Court of Appeals of Arkansas
Opinion delivered May 25, 1983
[Rehearing denied June 15, 1983.]

*Robert A. Newcomb,* for appellant.

*Steve Clark,* Atty. Gen., by: *Velda P. West,* Asst. Atty. Gen., for appellee.

GEORGE K. CRACRAFT, Judge. Billy Frank Gross appeals from his conviction of the crimes of murder in the second degree and kidnapping for which he was given consecutive sentences totaling 24 years in the Department of Correction. He contends that the trial court erred in denying two motions for mistrial for misconduct of the prosecuting

attorney and in not suppressing the testimony of a police officer who overheard his confession to the killing. We find no error in the rulings of the court on those issues. Appellant also contends that the trial court erred in permitting the prosecutor to impeach his own witness by his reference to prior inconsistent statements concerning Gross's participation in the killing where the probative value of the impeachment was far outweighed by the danger of prejudice and was a subterfuge for getting the information to the jury in the hope that it would give it substantial value. We do find error in the court's ruling on this issue, but only as to the murder charge. Consequently we affirm his conviction on the charge of kidnapping but reverse and remand the conviction of murder in the second degree.

The admissible evidence viewed most favorably to the State reflects that on the night of March 21, 1981 Gross picked up two or more companions and requested that they help him retrieve some tools which had apparently been taken from him. Dale Blackmon, Jr., who was suspected of having knowledge of the whereabouts of these tools, was forced into Gross's vehicle and held against his will while Gross and his friends threatened him with knives and a gun and beat him until he directed them to the home of one man who had some of the tools. Blackmon was then further abused until he directed them to the residence of Larry Baker who was thought to have the rest of the tools. In a previous unsworn written statement Bobby Franklin McReynolds, who was one of those in the vehicle at the time, stated that Gross went to Baker's door armed with a pistol and an argument followed. He had also stated that Gross had admitted shooting Baker. Blackmon, who heard the shot but did not witness the killing, also identified Gross as having been the one who went to the door of Baker's home. Officer Vickers testified that during the course of his investigation he inadvertently overheard a conversation in which Gross admitted that he had shot Baker and participated in the kidnapping of Blackmon.

## THE MOTIONS FOR MISTRIAL

During the investigation of the crimes the police officers obtained unsworn statements from Bobby Franklin

McReynolds and James Croughen in which they admitted that they were with Gross both at the time Blackmon was abducted and terrorized and when Baker was killed. In these statements they both identified the appellant as the one who had gone to the door when the shot was fired and otherwise incriminated him. In these statements, of course, they both gave incriminating statements against themselves.

At the trial McReynolds was called as a witness for the State. After answering preliminary questions as to his identity and acquaintance with Gross and Croughen he was asked the following question:

Q.   Were you present with several other people when a black man was picked up at Seventeenth and Scott and beaten and taken to an address on East Seventeenth where a killing occurred?

A.   I'm going to take the Fifth on that.

After an in-chambers hearing the court denied the motion for mistrial. Subsequently Croughen was called as a witness for the State and after answering the same identifying questions was asked:

Q.   Do you recall getting with Mr. Gross at any time when a black man was in the vehicle Mr. Gross owned?

After Croughen refused to answer on the ground that it might incriminate him, a similar motion for mistrial was made. The court also denied that motion.

The appellant contends that the trial court erred in denying these motions for mistrial because the prosecutor had called the witnesses with knowledge that they would plead the Fifth Amendment privilege and that the sole purpose was to get the information to the jury that a confession had been made, giving rise to an implication that a truthful answer would have been in the affirmative. We do not agree.

In *Sims* v. *State,* 4 Ark. App. 303, 631 S.W.2d 14 (1982) we recognized that the calling of a witness that the State

knows will refuse to testify can constitute reversible error where it is used as an unfair tactic to raise impermissible inferences in the minds of the jury to the defendant's prejudice. It is, however, well settled that the granting of a mistrial is a drastic remedy and should be resorted to only when the prejudice is so great that it cannot be removed. The declaration of a mistrial lies within the sound discretion of the trial court whose actions will not be reversed absent a clear showing of not only abuse of discretion but of prejudice likely to result. *Williams* v. *State,* 6 Ark. App. 410, 644 S.W.2d 608 (1982); *Branham* v. *State,* 274 Ark. 109, 623 S.W.2d 1 (1981). On appellate review we recognize that the trial judge is manifestly in a better position than we are to determine whether a prosecutor acted in good faith and whether justice could be served by a continuation of the trial. *Johnson* v. *State,* 254 Ark. 293, 493 S.W.2d 115 (1973).

In an in-chambers hearing held on each motion the prosecutor stated to the court that he had had no prior knowledge of the witnesses' intent to plead the Fifth Amendment privilege. He stated that he had first heard a rumor that they might refuse to testify shortly before the trial began. He stated that he had elected to call them, intending to request that they be granted immunity if they refused to testify. The trial court specifically found that the prosecuting attorney had acted in good faith.

Furthermore, we fail to see how any prejudice could have resulted from the court's ruling. McReynolds was granted immunity by the court and returned to the witness stand. In his testimony, which will be discussed in detail later in this opinion, he denied any knowledge of the beating or threats to Blackmon or of the killing of Baker.

Croughen was also granted immunity from prosecution but refused to testify even with immunity, and he did not return to the witness stand. In the in-chambers hearing on Croughen's motion the trial judge offered to give an instruction to the jury explaining his failure to return or his statements made in open court which might be requested by appellant's counsel. He requested none. Nor can we see how the unanswered question put to Croughen could in any way

prejudice the appellant. It could hardly give rise to any implication that the "any time" referred to was the date of the crime or that the black man was Blackmon. We find no merit in these contentions.

## THE STATE'S IMPEACHMENT
## OF ITS OWN WITNESS

The appellant next contends that the trial court erred in permitting the State to subsequently impeach McReynolds by reference to his prior inconsistent statements to police officers at the time he and Gross were arrested. In an unsworn pre-trial written statement McReynolds had stated that the appellant came to his home and asked him to help locate some missing tools. He stated that they first saw Dale Blackmon who was suspected of having information about the tools. They forced him into Gross's car against his will and kept him there for some time. They severely beat him and "roughed him up" until he directed them to the home of the deceased who was said to have had some of the tools. The appellant, armed with a pistol, had gone to the front door of the deceased's house where an argument ensued. He then heard a shot and the appellant returned to the car, at which time they all left the scene. He also stated, "I asked him if he had killed him and he said no, he had shot low."

During the in-chambers hearing on the appellant's motion for mistrial with regard to McReynolds' plea of the Fifth Amendment, the trial court appointed an attorney to advise him. The attorney agreed that the prior unsworn statement would incriminate both McReynolds and Gross. The court was advised by the attorney that although McReynolds agreed that he had made a statement to the police, he contended that the one read to him was an incorrect transcription of that statement and that he knew nothing about the kidnapping or homicide. The court advised him that this testimony would not tend to incriminate him and therefore immunity would not be warranted, but he insisted that he would not testify without immunity. The court granted limited immunity for the purpose of determining whether his request should be granted.

During that in-chambers hearing McReynolds' sworn testimony was favorable to both himself and Gross. Answering specific questions put by the prosecutor, he denied having made the incriminating statements against Gross which were in the written document. He again admitted having made a statement to the police but maintained that they had inaccurately transcribed it. He was specifically asked if he had stated that Gross went to the deceased's door armed with a pistol and argued with him. He denied making the statement. He also denied stating that he had heard a shot and that Gross admitted to him that he shot the deceased but denied that he killed him. Although his in-chambers testimony neither incriminated him or Gross in the kidnapping nor directly involved Gross in the homicide, the trial court granted him immunity and he returned to the witness stand.

Before the jury he testified, as he had in chambers, to no conduct which would incriminate either himself or Gross of the kidnapping of Blackmon. He could not identify the house or the area in which Blackmon had directed them but merely stated they stopped the car on Seventeenth Street. He stated that they all got out of the car but that no one went to the door. He denied that Gross had a gun and that he heard a shot. Over the objection of the appellant the State was permitted to ask him, as it had in chambers, if he had not made a statement to the police officers that Gross had gone to the deceased's door armed with a pistol and argued with him. He was also asked if he had not stated that he heard a shot and upon Gross's return to the vehicle was told by Gross that he had shot the deceased but had not killed him. McReynolds denied having made such statements. The written statement was not introduced and the police officers who took the statement did not testify with respect to it.

In support of their positions both parties cite a number of cases decided prior to the adoption of the Uniform Rules of Evidence. We conclude that the propriety of the court's ruling is controlled by four of these rules. Rule 607, Uniform Rules of Evidence, provides that the credibility of a witness may be attacked by any party, including the one calling him. Rule 613, Uniform Rules of Evidence, provides that a party

may be impeached by proof of a prior inconsistent statement so long as he is afforded an opportunity to explain or deny it. Rule 801 (d) (1) (i), Uniform Rules of Evidence, provides that an unsworn out-of-court statement may not be introduced as substantive evidence in a criminal trial. Rule 403, Uniform Rules of Evidence, provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

The State relies on *Chisum* v. *State*, 273 Ark. 1, 616 S.W.2d 728 (1981) in which the court held that the State might impeach a witness by a narration of her prior unsworn statements made in the presence of police officers when the witness testified she did not recall having made them. The court pointed out that there was no distinction between an inconsistent prior statement and one not able to be recalled. We do not consider *Chisum* as controlling here because the only objection to the evidence made at the trial was that it was hearsay. The trial court permitted the introduction of the statement as recorded recollections under Rule 803 (5), Uniform Rules of Evidence. The Supreme Court held that, although admitted for the wrong reason, the statements were admissible for purposes of impeachment pursuant to Rule 613 and therefore not subject to a hearsay objection. The court also pointed out that although admissible for impeachment an unsworn prior inconsistent statement was not admissible as substantive evidence as provided in Rule 801 (d) (1) (i). In *Chisum*, however, the balancing requirements of Rule 403 were not raised, argued or addressed by the court. The court ruled only that the prior inconsistent statements were deemed admissible for the purposes of impeachment.

Nor do we agree, as appellant contends, that the case of *Lawrence Smith* v. *State of Arkansas*, 279 Ark. 68, 648 S.W.2d 490 (1983) is controlling. In *Smith* the State's witness Hendrix had given an unsworn statement implicating the appellant, as well as himself, in the murder of Mrs. Rhoden. At the trial Hendrix, who had already been sentenced for his participation in the crime, repudiated his statement. The prosecution then introduced into evidence his unsworn written statement previously given to the

sheriff. The court admitted it for purposes of impeachment only. The Supreme Court rejected the argument that *Chisum* permitted evidence of the written statement because it was "manifest from the record that Hendrix's written statement was read to the jury, not for the purpose of impeachment but as substantive evidence to prove the truth of the matters asserted in it." The court reached this conclusion because both attorneys treated it as substantive evidence in argument and the jury was given an instruction which invited the jury to consider it. The balancing requirements of Rule 403, Uniform Rules of Evidence, were neither argued nor mentioned by the court and were not an issue in that case.

In the case now before us the written statement was not introduced into evidence as in the two earlier cases; nor was extrinsic evidence of the statements offered by the officers who purportedly heard them. The witness was merely asked if he had made the specific statements and he denied it. Here the requirements of Rule 403 were raised before the trial court and argued on appeal. We conclude that Rule 403 is controlling on the issue presented to us.

Although this case may be distinguished in several respects from the recent decision of *Roberts* v. *State,* 278 Ark. 550, 648 S.W.2d 44 (1983), its rationale and implications are clearly applicable. In *Roberts* the State's witness had made an unsworn statement on the night of the homicide in which he stated that his parents were having an argument, that his father left the house but returned with a pistol and threatened to kill his mother, and that he grabbed her by the throat and shot her even though she was begging him not to. Several days later he recanted his first statement and gave another unsworn one in which he denied witnessing the killing or the argument. He stated that he was in the laundry room when he heard a shot and his father then asked him to call an ambulance. Shortly thereafter he made a third unsworn statement which was consistent with the second one. Prior to the trial the court denied appellant's motion to suppress the reference to the initial statement of the witness.

At trial the witness testified in accord with his two latter statements. He was then asked by the State if he had made the earlier statements and he admitted that he had but he averred that they were untrue. The court then admitted the initial statement into evidence for the purpose of impeachment.

The court held that it was error to permit the State to impeach its own witness for two reasons. It first applied the well established rule that once a witness has openly admitted making the prior inconsistent statement it cannot be proved a second time through other witnesses. An admitted liar need not be proved to be one. The court further held that under the circumstances of the case it was error even to ask the witness if he had made the prior inconsistent statements, thereby getting the prior statements before the jury in the form of questions put to the witness by the prosecutor. The court reasoned that the prejudicial effect on the defendant of this line of questioning would far outweigh its probative value of attacking the credibility of the witness on the stand. There the court said:

> We must still decide whether the trial court erred in allowing the State to impeach Richard, its own witness, with his December 23 hearsay statement by *asking him if he had in fact made the prior inconsistent statements.* Under the circumstances of this case we believe the trial court erred by allowing the impeachment because the probative value of such testimony was far outweighed by the danger of unfair prejudice. Therefore, this evidence should have been excluded under Rule 403, Ark. Stat. Ann. § 28-1001 (Repl. 1979).

The State argues that asking Richard about his prior inconsistent statements was for impeachment purposes, but it really was a mere subterfuge. The only conceivable reason that the State could have for impeaching its own witness was to bring before the jury hearsay information not admissible as substantive evidence, hoping that the jury would accord it substantive value although it was clearly inadmissible as such under Rule 801 (d) (1) (i). In this instance the danger of convicting the defendant on unsworn testi-

mony is too great; the limiting instruction to the jury directing them to consider the prior inconsistent statement for impeachment only was not a sufficient safeguard. (Emphasis supplied)

In *Roberts* the State knew from the three statements and from the hearing on the motion *in limine* that the witness would not testify in accord with his initial statement. Here when McReynolds was returned to the witness stand the prosecutor knew full well from his testimony given under oath and grant of immunity that McReynolds had denied making the statements attributed to him in the written statement and would do so in the presence of the jury. At that point in his testimony he had merely identified himself and admitted knowing Gross. He had not directly contradicted or damaged any evidence which the State had offered. In chambers he asked, and over proper objection was granted permission to ask, the witness if he had made the statements attributed to him. As in *Roberts* we conclude that any advantage the State might gain by discrediting him under these circumstances was far outweighed by the risk of prejudice resulting from disclosing to the jury the content of the statements even though the witness denied having made them.

The impeaching questions put to McReynolds in the presence of the jury related only to the homicide. None were asked regarding his statements about the kidnapping or Gross's involvement in it. We therefore find reversible error only in the conviction for second degree murder and affirm the conviction on the charge of kidnapping.

Although we reverse the conviction for those reasons, we will address the third issue raised on appeal because of the likelihood that it will again be an issue on retrial.

## THE MOTION TO SUPPRESS EVIDENCE

When the police arrived at the scene of the homicide they were informed by neighbors that the person committing the homicide had fled the scene in a white and red Lincoln Continental. Officer Vickers was subsequently

informed that this vehicle might be found at an apartment house located at 1605 Scott Street in Little Rock. Although Officer Vickers did not consider this informant entirely reliable, he and two other officers went there to investigate.

The appellant owned an apartment building at that location. The building contained three apartments — two faced Scott Street and the third fronted on an alley behind the building. The appellant resided in one apartment fronting Scott Street and rented out the others. Charles Pearson was a tenant of the rear apartment which faced the alley. The appellant also owned an adjoining apartment building at 1507 Scott Street. That building contained three apartments, similarly arranged and all occupied by tenants.

Vickers and the other officers parked their car at the corner. Vickers walked down the sidewalk in front of 1605 Scott and sent the other officers to the rear of the apartment. As Vickers reached the corner of the building he saw a vehicle matching the description furnished him parked in a driveway common to both apartments and leading from the alley. He did not then know the identity of the owner of the vehicle or in which of the apartments the owner might be found. He walked along a sidewalk between the two apartments toward the vehicle. As he came to the rear corner of the apartment he overheard voices discussing the homicide. The door to the rear apartment, occupied by Pearson, was open "about half way" and he could hear the conversation clearly and see into the apartment from where he stood. He stepped closer and overheard the appellant tell six persons in that apartment about the incident and that he had killed one man and should have killed the other one. He further advised his companions not to say anything about it because it could not be proved that he had done it.

The appellant contends that the officer's opportunity to hear those conversations resulted from an illegal intrusion onto his curtilage and a place where he had a reasonable expectation of privacy, that it was obtained in violation of his Fourth Amendment right and that it should have been suppressed. We do not agree.

The record is not clear as to who controlled the area where the officer was standing, whose curtilage it was, or whether it was used by all of the occupants of those buildings, their guests and those supplying them services. That factor, however, is not controlling. It is a person's reasonable expectation of privacy, not a specific place, which is protected by the Fourth Amendment. *Katz* v. *United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967). In *United States* v. *Magna,* 512 F.2d 1169 (9th Cir. 1975) which involved a police officer's observation while in a private driveway, it was pointed out that although the driveway was part of the curtilage of the house, "a reasonable expectation of privacy and not common law property distinctions now control the scope of the Fourth Amendment." The proper inquiry is whether the officer's intrusion onto the residential walkway constituted an invasion into an area the resident might reasonably expect to be private. The test in each case should be that of reasonableness, both of the possessor's expectation of privacy and of the officer's reasons for being where he was. We recognized and applied these rules in *Gaylord* v. *State,* 1 Ark. App. 106, 613 S.W.2d 409 (1981); *Ingle* v. *State,* 8 Ark. App. 218, ___ S.W.2d ___ (1983).

We first consider the reasonableness of appellant's expectation of privacy. It is clear that the apartment in which the overheard statements were made was not the residence of this appellant. It was leased to and occupied by Charles Pearson and his family and the appellant was there on Pearson's invitation only. While this would not be conclusive, it is certainly a factor which the trial court could consider in determining whether his expectation of privacy at that place was reasonable. Another factor to be considered is that the door to the apartment had been left open. Conversations being conducted in it were loud enough to be heard for some distance. The statements were made by the appellant to six or seven other persons who were present.

We next consider the officer's reasons for being where he was. It is to be initially noted that he was not conducting a search of the property but was investigating information that a vehicle, which was in fact there in plain view, would be found at that location. While standing on Scott Street he

observed the vehicle parked at the rear of the building. According to the description furnished him it was reasonable for him to conclude that this might be the vehicle mentioned by the witnesses to the homicide. The only way to ascertain that it was in fact the vehicle was to investigate further. He did so by going to it by the shortest and quickest route available. The police officer had no knowledge of the owner's identity or in which, if any, of the apartments he might be found. His purpose in walking between Scott Street and the alley was not to eavesdrop but merely to check on the vehicle. It is clear from the evidence that the conversation was clearly audible to the "naked ear" and was overheard inadvertently. In these circumstances we cannot conclude that the trial court erred in determining that appellant's expectation of privacy at that location was "not reasonable" or that the officer's reason for being there was "reasonable." We find no error in the court's ruling that this evidence should not be suppressed.

Affirmed in part and reversed and remanded in part.

MAYFIELD, C.J., concurs.

MELVIN MAYFIELD, Chief Judge, concurring. I concur in the reversal of the murder conviction in this case. It is my view that much of the confusion in the cases discussed results from a failure to recognize that under our Uniform Evidence Rule 607 a witness may now be impeached by the party calling him — contrary to the law as it existed prior to the adoption of the Rules.

This does not mean, however, that a party may call a witness just to show that the witness is untruthful. Thus, where it is not necessary to call him, or where you know his testimony will not help you, it would be improper to elicit testimony simply to discredit the witness or to reveal prior inconsistent statements which you could not otherwise get into evidence. Regardless of the intention, this is the result of what occurred in the instant case and because it was prejudicial, I agree to the reversal.